1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16

| | |
|---|---|
| JONQUEL BROOKS, | Case No. 1:13-cv-01683-LJO-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| J. SOTO, Warden, | |
| Respondent. | |

17      Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

18 to 28 U.S.C. § 2254.  (Pet., ECF No. 1).  He is represented in this action by Charles Carbone,

19 Esq.   Respondent is the Warden of California State Prison, Los Angeles County.   He is

20 represented in this action by Rebecca Whitfield, Esq., of the California Attorney General's

21 Office.

22                                      **I.**

23                               **BACKGROUND**

24      Petitioner is currently in the custody of the California Department of Corrections and

25 Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno,

26 following his conviction by jury trial on July 26, 2009, of the following charges: one count of

27 first degree murder in which he personally and intentionally discharged a firearm, proximately

28

1   causing death (Cal. Penal Code § 187(a) and 12022.53(d)); two counts of attempted murder in

2   which he personally and intentionally discharged a firearm, proximately causing great bodily

3   injury (Cal. Penal Code §§ 187(a), 664, and 12022.53(d)); and one count of attempted murder in

4   which he personally and intentionally discharged a firearm (Cal. Penal Code § 187(a), 664, and

5   12022.53(c)).  (Pet., Ex. A.)  He was sentenced to serve an aggregate term of nine years and four

6   months plus 100 years to life.  (Id.)

7          Petitioner timely filed a notice of appeal.  On December 21, 2010, the California Court of

8   Appeal, Fifth Appellate District, reversed the judgment and remanded the matter to the trial court

9   to hear and determine Petitioner's motion for new trial, though it found no prejudicial error in the

10  trial itself.  (Id.)  The motion for new trial was held before the trial judge, and the judge modified

11  the amount of restitution but reinstated the judgment and sentence.  (Pet., Ex. B.)  Petitioner

12  appealed to the Fifth District Court of Appeals, and the judgment was affirmed on May 16, 2012.

13  (Id.)  Petitioner then filed a petition for review in the California Supreme Court.  (Pet., Ex. C.)

14  On August 22, 2012, the petition was summarily denied.  (Pet., Ex. D.)  Next, Petitioner filed a

15  petition for writ of habeas corpus in the California Supreme Court.  (Pet., Ex. E.)  The petition

16  was summarily denied on March 13, 2013.  (Pet., Ex. F.)

17         Petitioner filed the instant federal petition for writ of habeas corpus in this Court on

18  October 17, 2013.  The petition presents the following four grounds for relief: (1) The trial court

19  violated  federal  law  when  it  prohibited  Petitioner  from  presenting  evidence  that  he  was

20  frightened during the shooting; (2) The trial court misdescribed the State's burden and deprived

21  Petitioner of his Sixth Amendment right to a jury trial; (3) The State violated Petitioner's federal

22  right to an impartial judge when the state court denied Petitioner's motion to have a new judge

23  decide  his  motion  for  new  trial;  and  (4)  Self-defense  and  related  jury  instructions  violated

24  Petitioner's right to present a defense and a fair trial.

25         Respondent filed an answer to the petition on March 12, 2014.  Petitioner filed a traverse

26  on March 21, 2014.

27  //

28  //

2

# II.

## STATEMENT OF FACTS[1]

### A. Prosecution Evidence

The University Village Apartments is a three-story complex on East Barstow near Cedar. It provides housing for students at Fresno State University. The individual apartment units consist of separate sleeping quarters, each with lock on the door, and a common living room/kitchen area. Apartment 126, which is on the ground floor, has four separate bedrooms. As of May 7, 2007, [footnote omitted], Lewis Carrol resided in bedroom A, appellant resided in bedroom B, Rion Spears resided in bedroom C, and Guillermo Meneses resided in bedroom D.

About a month before May 7, appellant showed Meneses a gun. Carrol recalled appellant showing him a pistol a couple of times between Christmas and spring break. At one point, appellant told Carrol that he had "gotten jumped" by some Mexicans and hit with a bottle, and that his left eye had been hurt and he could go blind if he were hit there again. As a result, appellant told Carrol that he had "gotten jumped" by some Mexicans and hit with a bottle, and that his left eye had been hurt and he could go blind if he were hit there again. As a result, appellant, who was African–American, was not quick to trust Hispanics. However, he and Carrol, who was Native American and Hispanic, had only normal roommate problems that were not attributable to race. Although Carrol never observed appellant to be nervous or have a problem around large groups of people, appellant did not like to be touched.

Eyewitness accounts differed as to what took place on May 7.

*Guillermo Meneses—*

Meneses was in his room, studying, at approximately 11:00 p.m. Taking a break, he went into Carrol's room to play video games. He saw Brant Daniels, Rodrick Buycks, Drew Pfeiff, Kodi Shiflett, and a couple of other people walk in through the hallway. At no time did Meneses see a weapon in any of their hands.

The group headed toward appellant's room, and Daniels and Buycks started talking to appellant. The conversation quickly escalated into a confrontation in the hallway in front of appellant's room. Shiflett and Pfeiff were kind of in the back, and, when Meneses stepped out of Carrol's room, Pfeiff told him that they thought appellant had stolen a PlayStation 2 console.

Daniels and Buycks accused appellant of taking the console; appellant denied it. This went back and forth a few times near the door to appellant's room. Meneses saw Daniels enter appellant's bedroom, and appellant loudly told him to get out. At some point,

---

[1] The Fifth District Court of Appeal's summary of the facts in its December 1, 2010, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

Buycks approached appellant; Daniels, who was trying to be the peacemaker, physically touched appellant in an attempt to create space between the two. He told Buycks, "'calm down, he's going to give it to us,'" although Meneses had never heard appellant admit he took the PlayStation. Meneses did not recall any other touching of appellant or any threatening gestures such as balling up or pounding of fists, although at some point he heard Daniels say to appellant that appellant had better tell them where the PlayStation was. It did not appear to Meneses that anyone was under the influence of alcohol, and he did not see anyone force any doors.

Daniels exited appellant's room, and the group walked toward the kitchen and the door. Appellant told the group more than once to get out of his house. It seemed to Meneses that the four visitors were starting to walk out. Daniels told appellant that appellant had better give them a call when he got the PlayStation 2 back. As the four were on their way out, Meneses saw a gun in appellant's hand. Those in the group asked if he were serious and told him to put it away. They kept arguing, and appellant fired a warning shot at the ground. When the group moved back into the kitchen, and prior to seeing the gun, Meneses activated his cell phone's video recorder because he thought there was going to be a fight. He recorded 15 seconds, which was all his phone allowed. The video was played for the jury. Loud arguing and the first shot can be heard on the recording, which we have viewed. At the time, Daniels was by the kitchen counter.

Fearing for his own safety, Meneses grabbed Carrol and they locked themselves in Carrol's room. Meneses then heard what sounded like at least four shots and "a bunch of commotion." Meneses could not tell whether it stayed in the room or moved elsewhere.

*Lewis Carrol—*

Carrol and Meneses were in Carrol's room at about 11:00 p.m. Someone knocked at the apartment door, but Carrol did not see if appellant opened it. When interviewed by Officer Williams at the apartment complex, Carrol related that five subjects came to the front door and appellant let them in. The conversation started off "real loud," but Carrol did not think anything of it at first. When it stayed loud, however, he and Meneses left the bedroom. Carrol saw appellant arguing with Daniels and Buycks. Shiflett and Pfeiff were also there, as was another male Carrol did not know, but that person left. Daniels and Buycks said they knew appellant took their PlayStation 2, and that he had better give it back. Appellant repeatedly denied having the item. The subject of a stolen PlayStation was a surprise to Carrol, but he remembered hearing appellant talking on the phone and asking somebody for some cords. According to Carrol, appellant had his own Playstation before the first week of May.

The argument moved to the hallway by appellant's room. Either Daniels or Buycks started to go into appellant's room, and

appellant said the person was not about to go through appellant's things. When Daniels and Buycks said they just wanted to get the PlayStation back, appellant said he did not have it and did not know what they were talking about. Carrol believed Daniels went in appellant's room and appellant followed him inside. Pfeiff, who was acting normally, told Carrol they knew appellant had the PlayStation. Carrol was ready to take appellant's side if things got violent.

The argument seemed most intense between appellant and Buycks. They were kind of coming at each other, and Daniels, who was in the doorway to but a little outside of appellant's room, pushed appellant sideways into the room. Appellant told Daniels to get off him and not to touch him. To Carrol, Daniels's movement appeared to look to appellant like an aggressive act. Carrol told Officer Williams that there were two main people arguing with appellant, that they were arguing in appellant's bedroom, and that it appeared Daniels was restraining appellant from attacking the third person. Insofar as Carrol could see, however, none of the visitors had a weapon.

When the argument moved from appellant's room toward the kitchen, everyone noticed that appellant had a gun in his hand. It was a revolver appellant had previously shown Carrol. Appellant had shown Rion Spears, who also lived in apartment 126, a .22–caliber revolver that held six shots. Spears was aware that appellant was selling marijuana out of the residence. Spears kept two guns in his room when he lived at the University Village Apartments, although he did not sell marijuana.

In October or November of 2006, appellant told Buycks, Daniels, and Jason Davenport that he had spent the day at the shooting range, firing all different kinds of guns. Appellant specifically mentioned a .22. He said it was one of the best weapons with which to murder someone because it was a revolver, so there were no shell casings, and a person did not really have to aim with it but just hit the target in the upper body because the bullets rattle around.

One of the group asked appellant what he needed that for. Appellant said they needed to leave. They asked if he was serious, and he said yes, he was serious, that they needed to leave and he did not have their PlayStation. The exchanges were laced with profanity and racial epithets. Appellant was holding the gun in his right hand and swinging it, with his elbow bent at about a 90–degree angle.

The group continued to argue. Everyone was moving around. Appellant was in the area between the living space and the kitchen. Shiflett and Pfeiff were in and out. Daniels was in the kitchen, and Buycks was in the kitchen toward the apartment entryway. Nobody made any kind of threatening gesture toward appellant.

Appellant stomped his foot and again said the group had to leave. About this time, the first shot went off. The gun was pointed down,

and Carrol saw appellant flinch. The group did not retreat; instead, the argument continued, and Buycks asked if appellant was serious. Appellant said he was, and that they needed to leave. Daniels said all right, that they saw how it was. Carrol estimated that all told, appellant asked the group to leave about five times. Buycks made a gesture toward appellant, which Carrol interpreted as Buycks putting up a front and acting like he was coming at appellant although he really was not. This occurred kind of in the doorway. The door from the kitchen into the hallway outside the apartment was open, and Daniels was restraining Buycks.

Meneses and Carrol went back into Carrol's room. Carrol still did not see any of the visitors with any weapons. At no time did he see any of the group pound his fist into his hand in a threatening way, and he did not hear Daniels say anything about having people who would come and get appellant. However, Daniels and Buycks were both over six feet tall, and Buycks was stockier than Daniels. Both were taller than appellant.

As Carrol started to shut the door to his room, he looked back down the hallway. He believed someone who had been at the apartment earlier that evening had returned, and that this person sort of "sparked" the group, which had been starting to leave, so that another argument erupted. There was confusion over whether this person was Eric Stinnie or Kelvin King. Carrol saw appellant on the side of the breakfast bar with the gun pointed toward the entrance. Carrol shut and locked his door, then heard several shots. It sounded like a few were fired inside the apartment and a few outside. It then sounded like appellant went back to his room, shut and locked his door, and then took off.

Carrol and Meneses exited Carrol's room about three to five minutes after the shots. Nobody was left in the apartment. Appellant telephoned Carrol half an hour to an hour later and asked if Carrol knew he did not want to shoot them and that they would not leave. Appellant gave the impression of wondering if what he did was right and asking what Carrol had seen and if Carrol thought it was justified.

*Rodrick Buycks—*

Buycks was six feet two inches tall, weighed about 205 or 210 pounds, and lived down the hall from appellant at the time of events. They were on a recreational basketball team together, along with Shiflett and Daniels. Their relationship was friendly. Shiflett and Pfeiff were Buycks's roommates, and Daniels was a friend. The front door of their unit was usually unlocked so that their friends could come and go.

A week or two before May 7, Buycks's PlayStation 2 went missing from the common living area of the unit. Certain cords had to be plugged into it to make it work. Buycks suspected the item was either in appellant's apartment or a particular apartment upstairs, but, about a day after the item went missing, appellant telephoned and asked if Buycks had cords for a PlayStation 2. Buycks talked

to his roommates, and they concluded appellant had probably stolen the PlayStation 2. They decided to talk to him about it. As a result, at about 11:00 p.m. on May 7, Buycks, Daniels, Pfeiff, and Shiflett headed over to appellant's apartment. They were dressed casually in shorts and T-shirts. No one had any kind of weapon; they were not anticipating trouble, even though appellant had shown Buycks a .22–caliber revolver once or twice before.

Buycks's group knocked on the door and rang the doorbell of appellant's unit, and appellant answered the door. The group then went into the living room/kitchen area and started talking. There was a period of regular conversation, then things became heated. Daniels and Buycks were mostly doing the talking; Buycks demanded that appellant return the PlayStation 2, and appellant denied taking it.

Appellant started walking back toward his bedroom, and Buycks and Daniels followed. Appellant entered his room. Buycks, who was in the doorway area, saw him grab at something around his bed area. After a minute or two, appellant came back out. He seemed to become more angry.

The discussion moved back toward the living room/kitchen area. Buycks did not notice anything in appellant's hands until appellant pulled a gun and shot at the ground. This was in the kitchen/living room area. Buycks believed that he was standing in front of the door at the time, while Daniels was near the end of the counter. Someone else was standing by the refrigerator, which put that person closer to the apartment entrance than Daniels. Just before the shot was fired, a friend of appellant's, whom Buycks did not know but believed may have been Kelvin King, came into the apartment.

When the first shot was fired, Buycks and his group moved closer to the door. Buycks told appellant that he knew appellant had his PlayStation 2, and he wanted it back. There was a lot of shouting going on, and Buycks could not remember clearly whether anyone else said anything to appellant. Appellant was yelling at them to get out. One of Buycks's group opened the door, and appellant shot three more times. Buycks actually saw him fire the three rounds. The first time appellant fired, he was pointing the gun at Pfeiff; the second time, he was pointing it at Daniels; and the third time, he was pointing it at Buycks. Buycks and his companions ran. The whole incident lasted 10 to 15 minutes.

Buycks was shot once in the neck. During the incident, no one in his group forced open any door, pushed appellant, or knocked appellant to the ground. Nobody made any threats of physical force or violence or that they were going to come back. Buycks believed Daniels probably gestured with his hands during the incident, but it was not done in a threatening manner. It was just how Daniels talked. Buycks did not see anyone take a fist and pound it into the palm of his hand.

Drew Pfeiff—

As of May 7, Pfeiff, who was approximately six feet tall and 250 pounds, lived with Buycks, Shiflett, and a third person in apartment 128, which was next door to appellant's unit. Appellant would occasionally come over to play video games. Once, he showed Pfeiff a revolver he was carrying on his person as he came in from an exit that led outside onto a public street. Although Pfeiff did not trust appellant, they had no disputes when appellant visited.

On the evening of May 7, upon concluding that appellant was the one who had stolen the PlayStation 2, Pfeiff, Buycks, Shiflett, and Daniels went to appellant's apartment. Eric Stinnie, who lived on the third floor of the complex and was friends with the group and with appellant, had gone to appellant's a bit ahead of the group. When they arrived, the door was closed. Somebody knocked, and appellant answered and let them in. They walked into the common living area, and Buycks told appellant that they knew he was the one who took the PlayStation, and that they wanted to give him the opportunity to do the right thing and give it back. Buycks's demeanor was very calm at this time. Appellant became very defensive. He denied taking it, and said he did not need to steal because he had lots of money.

After Buycks and appellant began to go back and forth, appellant's roommates came out. Pfeiff had a very friendly discussion with them, and so had his back turned to the argument between Buycks and appellant. Pfeiff felt appellant go into his room. He did not know where Daniels was and did not see anyone follow appellant to his doorway or into his room. When appellant came back out, Pfeiff saw a gun in his hand. Appellant began yelling at the group to get out of his house. People were yelling back, and somebody questioned the need for a firearm. No one in the group was armed. Appellant did not say anything in response to the comment that the gun was not needed; instead, he just fired. Those in the group were making their way toward the door to leave, and the shot was fired in their direction. When the first shot was fired, Pfeiff was three to six feet from appellant.

Pfeiff and his companions tried to get to the door as fast as they could. They were no longer arguing about the PlayStation, but were making comments about the gun and saying don't shoot. Daniels was ahead of Pfeiff, getting ready to go out the door, and he turned back and asked if appellant was going to shoot them. Pfeiff heard a gunshot and saw a pained look on Daniels's face. Pfeiff was shot in the shoulder and may have actually been the first person shot, but initially did not realize he was wounded. No more than half a minute elapsed between the first shot and the remaining shots. Pfeiff estimated that approximately five minutes elapsed from the time he entered appellant's apartment to the time he ran out.

Pfeiff made his way out the door and turned left toward his apartment. Pfeiff recalled hearing Kelvin King outside the apartment as Pfeiff was exiting. As he ran south down the hallway, he heard shots being fired behind him. It sounded like the gun was

8

being fired in the hallway, not inside apartment 126.

To Pfeiff's knowledge, no one in his group was under the influence of alcohol or drugs when they went to appellant's apartment. No one forced any doors open, and he did not see anyone push or hit appellant. He did not see appellant knocked to the ground, and did not hear anyone threaten appellant. He did not hear Daniels say anything about having someone to come get appellant. He did not see anyone pound their fists into their hands.

*Kodi Shiflett—*

As of May 7, Shiflett resided in apartment 128. He was on the same recreational basketball team as appellant, whom he had known since high school. Shiflett was aware of appellant being in possession of a revolver on several occasions during 2007. Most of the time, it was in his pocket. Fresno Police Detective Alcorn interviewed Shiflett not long after the shooting. Shiflett told him that this was the first time he had ever seen appellant with a gun, although appellant had said he had one. In Shiflett's opinion, appellant tried to project a tough guy, streetwise persona.

When Shiflett and his roommates got together before going to appellant's apartment to discuss the missing PlayStation, no violence was mentioned or contemplated. They had had no problems with appellant prior to that time, but they believed he had the PlayStation, and so they were going to go to his apartment and get it back from him. It did not appear to Shiflett that anyone was under the influence of alcohol or drugs.

When the group arrived at appellant's apartment, Daniels either knocked or just walked in. Daniels and Buycks then started asking somewhat loudly for the PlayStation and saying they knew appellant had it. Appellant responded that he did not have it and did not know what they were talking about. The argument then got very loud and went back and forth, with Daniels and Buycks saying they knew appellant had the PlayStation and appellant denying it.

During the initial argument, Shiflett was by the front door to the apartment. Daniels and Buycks were inside a bit farther, between the breakfast bar and a wall. They were facing appellant, who was somewhat in the living room. Appellant then went to his room. Daniels went with him. Buycks went to the hallway, but did not go all the way into the room. Shiflett went to the start of the hallway that led from the living area to appellant's room. It sounded like Daniels and appellant were still arguing, then Daniels said "'what's that'" or "'what's this.'" It appeared Daniels was pointing. Up to this point, Shiflett had not seen anyone touch or be physical with appellant.

Daniels exited appellant's room almost immediately. He and Buycks started walking toward the front door, and Shiflett and Pfeiff followed. When appellant came out of his room, Shiflett saw that he had a gun by his side. Shiflett did not remember anyone

arguing at that point, although Daniels asked appellant if appellant was going to shoot them.

At the time appellant fired the first shot, Shiflett was standing right next to the front door. Appellant was standing near the end of the breakfast bar. Daniels was directly in front of appellant, and Buycks was to Daniels's left, along the wall. Pfeiff was to Shiflett's left. Just prior to appellant firing, nobody had touched or pushed him or made any threatening gesture toward him.

The first shot was fired at the floor. After it went off, it seemed like Shiflett's group was kind of frozen. Shiflett could not remember if anything was said. Appellant fired again, and Shiflett started to move for the door. This time, the gun was pointed at the group. Shiflett could not recall it being pointed at anyone in particular.

Shiflett, who was uninjured, was first out the door. As he ran, he heard other shots being fired. It sounded like the gun had travelled from inside the apartment out into the hallway. Shiflett turned into one the breezeways, then saw appellant and someone he believed to be King, going upstairs. King had been present in appellant's apartment just before the first shot.

At no time during the entire event did Shiflett see anybody force open any doors, push or shove appellant, or knock him to the ground. Shiflett's group was standing about three feet from appellant at the time of the first shot. Shiflett testified that his group was about a foot to a foot and a half away, but, when asked to demonstrate the distance at trial, pointed to something the court described as a minimum of three feet away. Nobody was touching appellant at that time. Shiflett did not hear anybody threaten appellant, nor did he hear Daniels say anything about having someone to come get appellant. Shiflett did not see anyone pound their fist into their palm in an aggressive manner.

As of May 7, Albert Ticer lived in apartment 102. Daniels was his roommate. At about 11:00 or 11:15 that night, Daniels came into the apartment, said that appellant had just shot him, and collapsed.

Daniels, who was six feet two and a half inches tall and weighed about 156 pounds at the time of his death, sustained five gunshot wounds. He was grazed on the neck and one finger, and shot in the left front chest, the left back, and the left arm. The wounds were inflicted by .22–caliber bullets from a distance of more than two to two-and-a-half feet. The cause of death was perforation of the heart, liver, and left lung, due to multiple gunshot wounds. Toxicology tests showed Daniels had a small amount of marijuana in his system, and his blood-alcohol content was 0.06 percent.

Police were dispatched to the University Village Apartments at approximately 11:16 p.m. on May 7. Inside apartment 126, officers found possible bullet strike marks on a kitchen wall, the kitchen floor, and inside the entry door to the apartment. The marks were consistent with a small caliber such as a .22. There were no signs of forced entry into the unit or into the bedrooms inside the unit.

Outside apartment 128, which was directly south of and adjoined apartment 126, was a .22–caliber bullet.

**B.     Defense Evidence**

Appellant, who was 19 years old when the shootings occurred, testified that when he was 15, he attended his cousin's graduation, then they and two friends went to a party in Union City. Appellant was uncomfortable, and he and his cousin started to leave. As they did, appellant commented that he had told his cousin they should have gone to another party in Hayward or Oakland, because the party they were at was "'fucking weak.'" Someone said, "'What?'" Because they were in a cul-de-sac, the sound echoed and appellant could not tell who said it, so he repeated that the party was "'fucking weak.'" Someone said it was his sister's party. As appellant turned, someone swung at him. Appellant ducked, but was hit in the head with a bottle. His cousin ran. Appellant was hit in the head with another bottle, punched four or five times, and kicked for about a minute. No one came to his assistance, but, because appellant kept getting back up, his assailants finally ran. During the incident, 30 or 40 people were chanting the name of a local Norteno gang.

As a result of the altercation, appellant was hospitalized for four days and had to have surgery. He had a piece of glass inside his left eye, and also suffered a brain hemorrhage, detached retina, brain trauma, a concussion, and a fractured skull. An eye specialist told him that if he took a shot to the head or the eye, he could lose his eye and possibly his life. After the attack, appellant was no longer able to trust many Hispanics and did not want to be touched by too many people, and he had a fear of being around too large a crowd and not knowing exactly how they were going to react. At trial, appellant acknowledged that he had two Hispanic roommates as of May 7, and that of the four in Daniels's group, only Shiflett was Hispanic. Pfeiff was Caucasian, while Daniels and Buycks were African–American.

While appellant was in high school, he did a lot of volunteer work, including talking to and mentoring at-risk youth. As a result, he became friends with a lot of people, and in fact became so close to his friend Phillip that he referred to Phillip as his brother. Phillip was murdered on March 23, 2007. There were "a lot of threats behind his death" because of appellant's close friendship with Phillip, and this led to appellant purchasing a six-shot, .22–caliber Ruger revolver from Brant Daniels. Although appellant smoked marijuana and kept it in his room, and occasionally sold some to some of the residents in the apartment complex, he did not have a gun due to his marijuana use. The weapon was solely for protection, because he was receiving death threats.

At about 10:30 or 10:45 p.m. on May 7, appellant was playing a video game with Kelvin King. Eric Stinnie was also there. He had wanted to use a program on appellant's computer to burn a CD, and appellant had set up the program for him, but instead Stinnie just watched appellant and King play their game. When King got a call

11

from his girlfriend and went to leave, Stinnie told appellant that he did not have a CD to burn and would be back. Appellant, who was five feet nine inches tall and weighed about 143 pounds at the time, had smoked marijuana with King about two hours earlier; by the time of the incident, appellant was no longer feeling high.

Appellant walked King and Stinnie to the door and then locked it. Stinnie called about five minutes later and said he was at the door, so appellant let him in. Appellant closed the door and thought he locked it, and he returned to his room. He was on the phone when he heard the door open. Daniels, Buycks, Shiflett, and Pfeiff—all of whom were taller than appellant—came in. Daniels and Buycks exchanged greetings with appellant, then started yelling and demanding to know where their PlayStation was. Appellant said he did not have it.

At this point, Daniels and Buycks were in the kitchen, with Shiflett and Pfeiff behind them. Appellant was at the beginning of the tiles for the kitchen floor. Daniels and Buycks kept accusing appellant of stealing the PlayStation or knowing who did, and appellant kept denying it. They then told him to call the person he was always with. Appellant agreed, and told them that when he got it done, it was over, and they all should get out of his house.

Appellant believed they were referring to King, so he telephoned King and told him to come over. King agreed. Appellant walked toward his bedroom. He knew the others were following him, but he had already told them that they were not coming in his room, so he did not think they would enter. As he got to his doorway, however, he felt a nudge or push in his back. Daniels was closest to him at the time. Appellant grabbed his phone and reached under his bed and grabbed his gun. He was feeling threatened. At some point, Daniels went into appellant's bedroom, and Buycks followed into the hallway. They were yelling and pounding their fists into their hands and demanding the PlayStation. Appellant said he did not have it and told Daniels to get out of his room. He then made one more call to King to tell him to hurry and ask where he was. King said he was there, so appellant told the others that King was there and they could clear things up. As appellant and the others moved away from appellant's room, he kept telling them to get out of his house.

King was standing in the living room. Appellant asked him if they had the PlayStation, and King said no and told the group to now get out of the house. The visitors began to walk like they were going to leave, and appellant thought the situation was going to be over. Instead, Daniels turned around. There was a little bump. Appellant had his hand on the gun and the gun by his side, and he squeezed the trigger and shot himself in the right thigh. The bullet went into the ground, nicking his foot. Appellant was in the entrance hall, by the end of the breakfast counter. Multiple people said things. Appellant continued to tell the group to get out of his house. King also told them to leave. Daniels said, " 'it's like that, dawg, what the fuck you gonna do, shoot us?' " Daniels also said he had people on the way who could beat appellant anyway. He

and Buycks had been hitting their fists into their hands since shortly after they entered the apartment.

To appellant's knowledge, nobody but him had a weapon. He had never seen any weapons in apartment 128, but there were a lot of bottles in there, and he had been hit by a bottle before. Appellant was in fear because he was wounded, he could smell liquor on their breath, and he did not want to be put in a situation to be jumped again. Nobody was leaving, so he pointed the gun to see if they would leave when they saw it. They did not. Appellant waved the gun sideways and told them to get out. They still did not go, and so he fired into the crowd. Buycks lunged at him, and appellant shot again. Everyone froze and still did not leave. Appellant was concerned for his safety because he was wounded, and he was also concerned about why they were not leaving. He shot into the crowd one more time, but by then they had opened the door and so were turning to leave, but he had already fired. They then ran out the door, and he ran into his room. Scared and not knowing what was going to happen, he put on his shoes and fled. Appellant estimated that perhaps 15 to 20 minutes elapsed between when he realized Daniels and the others were in his apartment to when he put on his shoes.

Appellant threw the gun as he was on the stairs near the back parking lot. After leaving the complex, he tucked his hair into his beanie and started walking to a friend's house. On the way, he received an instant message from Will, who said he had heard what happened. Will told appellant to watch out for himself because there were people from Los Angeles out looking for him. Appellant knew Will to be an associate of Daniels. Both were from Los Angeles. In fear of these people, appellant cut his hair and changed his clothes at his friend's house, then got a ride to another location. He then called his mother, who lived in Houston, Texas, and his father, who lived in Hayward. He told them he had been involved in a shooting and he needed them to get him an attorney. His father retained an attorney, and appellant's surrender to police was arranged. Although appellant's attorney advised police where he believed the gun could be located, it was never found.

When appellant left the University Village Apartments, he did not know anyone was dead. Appellant did not intend to kill anybody.

Dr. Howsepian, a psychiatrist, opined that at the time of the shooting, appellant was suffering primarily from posttraumatic stress disorder (PTSD). He also had a dependency on marijuana.

PTSD is a response to a traumatic event. A traumatic event involves a perception of danger that is associated with a feeling of horror, helplessness, or intense fear. This is followed by a series of symptoms that can be clustered into three general areas: reexperiencing symptoms, such as nightmares or intrusive thoughts; avoidance and numbing symptoms, where the individual avoids reminders of what traumatized him or her; and hyperarousal symptoms, which are symptoms that keep a person in a constant state of arousal tension, being on edge, or being vigilant and

watching his or her environment to try to avoid being retraumatized. For a diagnosis of PTSD, the person must have a certain number of symptoms in each cluster, must have been exposed to a trauma, must have significant distress or impairment in function as a result, and must have had the symptoms for at least a month. If the person is treated properly, many individuals will no longer meet the criteria after a few months to a few years. Without proper treatment, the median time course is approximately three years. Some people remain chronic for decades. Psychiatric injuries make one more vulnerable to later psychiatric injuries.

It is common for people with PTSD to abuse alcohol or street drugs. In the case of marijuana, most people report feeling calmed and hungry. In a significant minority, however, other symptoms such as significant anxiety or even paranoia may be present. Appellant told Howsepian that the drug did not make him paranoid, but instead caused him to be more alert and energetic. It is also not uncommon for people with PTSD to carry weapons. They do so to protect themselves, as the world is perceived to be dangerous. According to Fresno Police Detective Galvan, drug dealers will carry weapon to protect themselves, their money, and their drugs. In his experience, it is common for street-level dealers to have guns on them at the time they are selling the drugs.

Howsepian explained that the 2004 attack was "profoundly traumatic" for appellant. One of the most important consequences of being traumatized in a way that precipitates PTSD is that the world is viewed very differently after the trauma. It is viewed as being dangerous and unpredictable, and the individual has a sense of significant insecurity. That appellant's cousin and friends left his side during the assault was highly likely to have amplified the sense of unpredictability, insecurity, and dangerousness of his world. The serious injury to appellant's eye caused him to have anxiety about reinjuring his eye and going blind, and caused a heightened sense of trying to keep his head and face safe from trauma.

Given that the attack was perpetrated by Hispanic men, it was not surprising that appellant had anxiety and fear and wanted to avoid Hispanic men walking in groups at the mall, for example, shortly after the attack. Moreover, due to generalization, an individual might be traumatized by one ethnic group, but then perceive potential threats by other people in different groups. Most people have the ability to tolerate people of the same ethnic group that might have assaulted them, as long as there is no sense of threat from them. The important ingredient is whether the individual senses some threat or perceives something in his environment that he feels is dangerous to him.

In addition to the 2004 attack, appellant reported a long series of traumatic incidents, starting with significant physical abuse at the hands of his mother's boyfriend when he was very young, as well as several firearm-related traumas, being robbed at gunpoint at age 16, and a series of deaths of friends. Appellant also reported receiving a number of threatening phone calls. Someone suffering from PTSD following a series of assaults with firearms may

1

2

3

4

5

6

7

8

9

10

respond to a perceived threat by having the body act before the mind does. The usual progression is a sense of threat causing fear that will result in escape if possible or in the person acting to deflect the threat. Stressful events unrelated to the trauma an individual has experienced may put that person into a kind of physiological hyperdrive that amplifies the sense of threat. When an individual is caught up in the kind of confrontation with which people suffering from PTSD have to contend, he or she often will not be able to clearly think through his or her options, such as using one's cell phone to call for help.

With respect to the present case, appellant was approached in a confrontational manner by a group of angry individuals. He felt trapped, had physical disabilities, and had a history of being traumatized. He felt he had nowhere to go and no way to flee the potential threat. In Howsepian's opinion, these things added up to an individual who perceived the threat in an amplified way and felt the need to act quickly to save himself.

(Pet., Ex. A.)

**III.**

**DISCUSSION**

**A.    Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  <u>See</u> 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

**B.    Standard of Review**

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  barred unless a petitioner can show that the state court's adjudication of his claim:

2

3    (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
     determined by the Supreme Court of the United States; or

4

5    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
     State court proceeding.

6

7  28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 131 S.Ct 770, 178 L.Ed.2d 624 (2011);

8  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

9    As a threshold matter, this Court must "first decide what constitutes 'clearly established

10  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

11  (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this

12  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

13  of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

14  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

15  set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

16  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

17  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

18  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

19  review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

20  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

21  Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

22  end and the Court must defer to the state court's decision. See Carey, 549 U.S. at 77; Wright,

23  552 U.S. at 126; Moses, 555 F.3d at 760.

24    If the Court determines there is governing clearly established Federal law, the Court must

25  then consider whether the state court's decision was "contrary to, or involved an unreasonable

26  application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28

27  U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ

28  if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

1  question of law or if the state court decides a case differently than [the] Court has on a set of

2  materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

3  72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

4  in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's

5  Third New International Dictionary 495 (1976)). "A state-court decision will certainly be

6  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

7  contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision

8  is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed

9  under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en

10  banc).

11        "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

12  the state court identifies the correct governing legal principle from [the] Court's decisions but

13  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

14  413. "[A] federal court may not issue the writ simply because the court concludes in its

15  independent judgment that the relevant state court decision applied clearly established federal

16  law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411;

17  see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility

18  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

19  Court's] precedents." Harrington, 131 S.Ct. at 784. In other words, so long as fairminded jurists

20  could disagree on the correctness of the state courts decision, the decision cannot be considered

21  unreasonable. Id. If the Court determines that the state court decision is objectively

22  unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

23  error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619,

24  637 (1993).

25        Petitioner has the burden of establishing that the decision of the state court is contrary to

26  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

27  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the

28  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

1  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669

2  (9th Cir. 2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

3      The AEDPA requires considerable deference to the state courts.  "[R]eview under §

4  2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

5  the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."

6  Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations

7  by state courts are presumed correct absent clear and convincing evidence to the contrary."

8  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

9  state court factual finding is not entitled to deference if the relevant state court record is

10  unavailable for the federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963),

11  *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

12      **C.**    **Review of Claims**

13      1.    Exclusion of Evidence

14      In his first claim for relief, Petitioner alleges the trial court violated Petitioner's rights to

15  due process and a fair trial when it excluded evidence that Petitioner was afraid. Petitioner

16  contends the trial court's rulings prevented him from presenting a defense.

17      This claim was presented on direct appeal to the Fifth District Court of Appeal and was

18  denied in a reasoned decision.  Petitioner did not present it in the petition for review before the

19  California Supreme Court, but he did present it in a subsequent habeas petition.  The California

20  Supreme Court summarily denied the petition.  Federal courts review the last reasoned state

21  court opinion.  Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  Therefore, the Court must review

22  the opinion of the Fifth District Court of Appeal.

23      In rejecting Petitioner's claim, the appellate court stated as follows:

24

25      A. Background

26      Appellant's defense at trial was that he was afraid and acted in self-defense. During defense counsel's cross-examination of Lewis Carrol concerning what took place during the confrontation, the following occurred:

27

28      "Q. And you stated earlier that—that Jonquel seemed angry?

"A. Right.

"Q. Did you ever see him become frightened?

"MR. FRANCIS [prosecutor]: Objection. Speculation.

"THE COURT: I'll sustain. It's vague also.

"MS. BOULGER: Yes.

"Q. During this time period after the first shot, did you—did it ever appear to you that Jonquel was frightened?

"A. *I think he might have been a little scared.*

"MR. FRANCIS: Objection. The answer is non-responsive. It is based on speculation.

"THE COURT: Hold on. The objection is speculation? Lacks foundation?

"MR. FRANCIS: Yes.

"THE COURT: Sustained.

"MR. FRANCIS: Ask that it be stricken.

"THE COURT: Answer will be stricken. Jury is admonished not to consider it.

"MS. BOULGER: Q. Okay. You discussed that you saw he was angry. Did you see him display any other emotions?

"A. Frustration." (Italics added.)

Appellant now contends the judgment must be reversed because the trial court excluded evidence that appellant was afraid during the confrontation. Appellant says that because Lewis was a percipient witness, a foundation was laid for him to render an opinion, and his opinion—that appellant seemed scared—was not speculation but instead was proper lay opinion testimony. Appellant further says the prosecutor was allowed to present evidence that appellant lacked fear, but appellant was not allowed to present testimony supporting his claim that he was afraid. Because the impressions of the percipient witness were vital to his defense, the argument runs, their erroneous exclusion constituted federal constitutional error.

B. Analysis

"A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid.Code, § 800.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) "Perception" is "the process of acquiring

knowledge 'through one's senses' [citation], i.e., by personal observation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1306, fn. omitted.) The rule "merely requires that witnesses express themselves at the lowest possible level of abstraction. [Citation.] Whenever feasible 'concluding' should be left to the jury; however, when the details observed, even though recalled, are 'too complex or too subtle' for concrete description by the witness, he may state his general impression. [Citation.]" (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127.) A trial court's decision whether to admit lay opinion "will not be disturbed 'unless a clear abuse of discretion appears.' [Citations.]" (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127; see *People v. Medina* (1990) 51 Cal.3d 870, 887, affd. *sub nom. Medina v. California* (1992) 505 U.S. 437.)

In the present case, defense counsel asked if it appeared to Carrol that appellant was frightened. The question—which, we note, did not elicit an objection—was proper and, had Carrol responded affirmatively, no valid objection could have been raised to the answer. (See *People v. Chatman* (2006) 38 Cal.4th 344, 397 [although lay witness generally may not give opinion about another's state of mind, percipient witness may testify about objective behavior and describe as being consistent with particular state of mind]; *In re Lucas* (2004) 33 Cal.4th 682, 710 [witness observed that defendant avoided and seemed afraid of certain individuals]; *People v. Petznick* (2003) 114 Cal.App.4th 663, 670 [witness testified that defendant seemed nervous and scared].) Courts do not always draw such a fine distinction between state of mind and objective behavior. For example, in *People v. Kennedy* (2005) 36 Cal.4th 595, 621, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459, the high court concluded that a witness's "opinion about defendant's state of mind on the night of the murder was admissible because it was based on her perceptions and helped to better understand her testimony. [Citations.]" (See also *People v. Webb* (1956) 143 Cal.App.2d 402, 412 [holding that lay witnesses may given opinions as to state of mind short of insanity affecting the formation of a specific intent].)

Carrol did not answer affirmatively, however; instead, he testified as to what he thought appellant might have been feeling. It was this answer that drew the objection, and rightly so. Appellant says Carrol was actually only relating the impression he received from his observations, namely that appellant seemed scared. Although it is conceivable the answer could have been interpreted this way, it is clearly not how the prosecutor or the trial court interpreted it. We cannot say the trial court abused its discretion by interpreting the answer as calling for speculation and constituting conjectural lay opinion. (See *People v. Thornton* (2007) 41 Cal.4th 391, 429 [under deferential abuse-of-discretion standard, reviewing court would not second-guess trial court's ruling that asking witness whether it appeared from vehicle occupants' behavior that they knew each other was speculative].)

Appellant complains that the prosecutor was able to present similar testimony over defense objection. He points to the prosecutor

1    asking Meneses if he was familiar with the term "claustrophobia"
     and if he noticed anything like that with appellant. As previously
2    noted, however, the prosecutor did not object when defense
     counsel asked a somewhat similar question to Carrol, but only to
3    Carrol's answer. Meneses's answer, by contrast, was clearly based
     on his observations of appellant. When the prosecutor asked Carrol
4    what appellant's state of mind or mood was when he was being
     accused of taking the PlayStation, defense counsel's objection, that
5    the question called for speculation, was sustained. A similar
     defense objection was sustained when the prosecutor asked Carrol
6    whether the fact there were a lot of spectators seemed to prevent
     appellant from possibly fighting someone during an intramural
7    basketball game. Accordingly, we reject the notion that the trial
     court's rulings were somehow unfair or one-sided.

8
     Last, assuming error occurred, in light of the record as a whole, it
9    is not reasonably probable the error affected the outcome of trial.
     (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People*
10   *v. San Nicolas* (2004) 34 Cal.4th 614, 663.) Contrary to appellant's
     assertion, this is simply not a situation in which the error rises to a
11   level of constitutional dimension. (See *People v. Fudge* (1994) 7
     Cal.4th 1075, 1102–1103; compare *Green v. Georgia* (1979) 442
12   U.S. 95, 97; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302.)

13   (Pet., Ex. A.)

14       A criminal defendant has a well-recognized constitutional right to present a complete

15   defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due

16   Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation

17   clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful

18   opportunity to present a complete defense.'").   Necessary to the realization of this right is the

19   ability to present evidence, including the testimony of witnesses.  Washington v. Texas, 388 U.S.

20   14, 19 (1967).

21       However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is

22   subject to reasonable restrictions," such as evidentiary and procedural rules. United States v.

23   Scheffer, 523 U.S. 303, 308 (1998).  In fact, "state and federal rulemakers have broad latitude

24   under the Constitution to establish rules excluding evidence from criminal trials," id., and the

25   Supreme Court has indicated its approval of "well-established rules of evidence [that] permit

26   trial judges to exclude evidence if its probative value is outweighed by certain other factors such

27   as unfair prejudice, confusion of the issues, or potential to mislead the jury."  Holmes v. South

28   Carolina, 547 U.S. 319, 326 (2006).  Evidentiary rules do not violate a defendant's constitutional

1  rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or

2  disproportionate to the purposes they are designed to serve." Id. at 324 (alteration in original)

3  (internal quotation marks omitted); see also Scheffer, 523 U.S. at 315 (explaining that the

4  exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it

5  "significantly undermined fundamental elements of the accused's defense").  In general, it has

6  taken "unusually compelling circumstances ... to outweigh the strong state interest in

7  administration of its trials." Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir.1983).

8          In the Supreme Court cases cited by Petitioner, however, the Court addressed established

9  state evidentiary rules.  In Crane, the Supreme Court rejected the Kentucky Supreme Court's

10  ruling that "once a confession has been found voluntary . . . the evidence that supported that

11  finding may not be presented to the jury for any other purpose.  Crane, 476 U.S. 683 at 687.  In

12  Washington, the Supreme Court determined that statutes which prevented codefendants or

13  coparticipants in a crime from testifying for one another, thus precluding the defendant from

14  introducing his accomplice's testimony that the accomplice had in fact committed the crime,

15  violated the Sixth Amendment because "the State arbitrarily denied [the defendant] the right to

16  put on the stand a witness who was physically and mentally capable of testifying to events that

17  he had personally observed."  Washington, 388 U.S. at 23.  In Chambers, the Supreme Court

18  "found a due process violation in the combined application of Mississippi's common-law

19  'voucher rule,' which prevented a party from impeaching his own witness, and its hearsay rule

20  that excluded the testimony of three persons to whom that witness had confessed.  Scheffer, 523

21  U.S. at 316 (citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

22          In this case, the issue concerns a discretionary ruling by the trial judge.  As the Ninth

23  Circuit pointed out in Brown v. Horell, "the Supreme Court has not decided any case either

24  'squarely address[ing]' the discretionary exclusion of evidence and the right to present a

25  complete defense or 'establish[ing] a controlling legal standard' for evaluating such exclusions.

26  Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) (quoting Moses v. Payne, 555 F.3d 742, 757

27  (9th Cir. 2009)).  This is fatal to Petitioner's claim.  Similar to the petitioners in Brown and

28  Moses, Petitioner cannot show that the state appellate court's ruling was either contrary to or an

1  unreasonable application of clearly established Supreme Court precedent.   Petitioner's

2  contention that relief is appropriate in the absence of a decision on point if the state court

3  decision "unreasonably refuses to extend [a legal principle from our precedent] to a new context

4  where it should apply," <u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000), was recently rejected by

5  the Supreme Court in <u>White v. Woodall</u>, __ U.S. __, 134 S.Ct. 1697, 1706 (2014).  The Supreme

6  Court stated: "[I]f a habeas court must extend a rationale before it can apply to the facts at hand,"

7  then by definition the rationale was not "clearly established at the time of the state-court

8  decision." <u>Id</u>. (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 666 (2004).

9        Moreover, there is no merit to Petitioner's claim that the trial court's ruling excluded

10  relevant evidence thereby denying him the right to present a complete defense.  The appellate

11  court found that the prosecutor's objections were properly sustained.  Defense counsel first asked

12  the witness: "Did you ever see him become frightened?"  The objection to the interrogatory as

13  vague and speculative was properly sustained.  Defense counsel, acknowledging the defect in his

14  question, then clarified with a follow-up question: "During this time period after the first shot,

15  did you – did it ever appear to you that [Petitioner] was frightened?"  The appellate court noted

16  that this was a proper question as to the witness's perception of Petitioner's objective behavior,

17  and no valid objection could have been raised.  In fact, no objection to the question was raised.

18  As noted by the appellate court, the answer to that question, "I think he might have been a little

19  scared," is what drew the objection.  The appellate court reasonably determined that the

20  objection was proper under California law, since the witness appeared to be testifying as to what

21  he believed to be Petitioner's state of mind, which is generally not permitted.  <u>People v.</u>

22  <u>Chatman</u>, 38 Cal.4th 344, 397 (2006).  The answer was stricken.  Moreover, the trial court's

23  rulings did not exclude the evidence of Brooks's behavior, because nothing prevented defense

24  counsel from clarifying the question for the witness.  Counsel could have informed the witness

25  not to testify to what he actually believed was the defendant's state of mind, but based on his

26  observations of defendant, whether he appeared to be frightened.  Thus, defense counsel could

27  have elicited testimony concerning Brooks's behavior.

28        Accordingly, Petitioner fails to demonstrate that the state court ruling was either contrary

1 to or an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. §

2 2254(d). The claim should be rejected.

3        2.      Trial Court's Description of Reasonable Doubt Standard

4        Petitioner next claims that the trial court incorrectly described the State's burden of proof

5 by comparing the beyond-a-reasonable-doubt standard with ordinary, everyday decisions,

6 thereby violating Petitioner's Sixth Amendment right to a jury trial.

7        This claim was raised on direct appeal to the California Court of Appeal where it was

8 denied in a reasoned decision. It was raised thereafter in the California Supreme Court by

9 habeas petition and summarily denied. The Court must review the last reasoned decision. Ylst,

10 501 U.S. at 803. The appellate court rejected Petitioner's claim as follows:

> *A. Background*
>
> Near the outset of jury selection, the trial court informed prospective jurors that in a criminal case, "a defendant is presumed to be innocent. This presumption requires the People to prove each element of a crime beyond a reasonable doubt, and that includes any special allegation. Until and unless this is done, the presumption of innocence prevails. And proof beyond a reasonable doubt is defined as follows: It's proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt, because everything in life is open to some possible or imaginary doubt."
>
> The next day, the trial court was questioning prospective jurors about prior jury experience, when one related that she had been a juror in an attempted murder case and had not liked the experience. She explained: "I'm kind of a black and white person, ... it's either right or wrong, and it dealt in what people were thinking. And—I mean, if you're holding a smoking gun, I think it's pretty sure that you've fired it and—and I wasn't pleased with the verdict ." When the court asked if she felt the experience would have any lingering effects, given that this was a completely different case, she responded that she did not know. She stated: "It's kind of like when you get in a jury room and you're deliberating, the majority rules, ... and you have to take under consideration what the person thought, and you have no idea what they're thinking, ... so you have to guess, and I just ... didn't find it a good experience." The court then asked if she would be able to deliberate on this case, or if she would "turn it off" because of her prior experience. The prospective juror responded that she would listen to the facts. The court again asked if she would be able to deliberate. She answered, "Well, what choice do you have?" She then elaborated that in the prior case, she and another juror were opposite everyone else, and the others kind of talked her into reasonable doubt. This ensued:

"THE COURT: Let me—let me just say this: This applies to everybody. Again, that's why I ask that question with those folks who know each other. You're going to decide a case for yourself, but would you listen to reason and logic—

"PROSPECTIVE JUROR ...: Yes.

"THE COURT:—and—and as one of the attorneys explained, ... and I've given you the instruction what reasonable doubt is.

"PROSPECTIVE JUROR ...: But how do you know what a person is thinking? There is no way of knowing.

"THE COURT: We've got a little bit into that. If I'm up here eating a burrito and I'm just wuffing [sic ] it down, your thoughts are, 'I think he's hungry,'—I mean, you look at conduct sometimes.

"PROSPECTIVE JUROR ...: Maybe you're stressed. Maybe you're eating under stress.

"THE COURT: But you have to make your best efforts, whatever you can do, give it—it's the same thing. When—on major decisions, and again, I'm not in any way correlating this trial to any of these things when I talk about them, but they are major decisions in our life; when we buy a car, when we buy that house, you know, do we just decide like buying that house like we decide buying groceries? No. We spend time on it. We look at a lot of facts. And do you ever buy a house or any major—you know, having all the facts before you, you know, you're always satisfied, like I have no concerns at all, here's my $500,000, $400,000 for that house? There's always something—you wish you had some more information. You just got to do the best you can do with what you got. Now, if you are the type of person that is not going to be able to do that, that's okay, maybe this is not the trial for you. If you say I can do that, albeit, maybe I had—my first experience wasn't that good, but I'm going to do it, I know what to expect this time, I can do it. You tell me. If—if you have some hesitation and you feel that, 'I better not sit on this,' now is the time to tell us.

"PROSPECTIVE JUROR ...: Well, I wished they—because I still feel the way I felt and, you know, it's been probably ten years, but I still feel like maybe I should have. I mean, I still feel that I—that maybe I should have held out for what I thought was—"

Defense counsel then questioned the prospective juror, who explained that she felt like she was talked into agreeing with the majority of the other jurors, not because she agreed with what they were thinking, but because she basically gave in, something she now regretted. After brief further questioning by defense counsel, the court invited a stipulation that the prospective juror be excused for cause. Both counsel agreed.

Appellant now contends the judgment must be reversed because the trial court's comments led jurors to believe they could decide the facts on the same quantum of evidence used in making

important decisions in everyday life, and thus amounted to a misinstruction on proof beyond a reasonable doubt. Appellant says this misstatement of the applicable standard of proof violated the federal Constitution and is reversible per se.

*B. Analysis*

In a criminal case, the due process clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessarily to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364 (*Winship*).) The beyond-a-reasonable-doubt requirement applies in state as well as federal proceedings. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 278 (*Sullivan*).)

When a trial court instructs the jury with a misdescription of the burden of proof by, for example, suggesting a higher degree of doubt than is required for acquittal under the reasonable doubt standard, reversal is required. (*Sullivan v. Louisiana, supra*, 508 U.S. at pp. 277, 281; see *Cage v. Louisiana* (1990) 498 U.S. 39, 40–41 (*Cage*), disapproved on another ground in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) The same result obtains when the trial court's instructions lower the prosecution's burden of proof by equating reasonable doubt with the standard people use to make decisions in their everyday lives. (*People v. Brannon* (1873) 47 Cal. 96, 97; *People v. Johnson (Glen)* (2004) 119 Cal.App.4th 976, 985–986; *People v. Johnson (Danny)* (2004) 115 Cal.App.4th 1169, 1171–1172.) The constitutional question in such a case "is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." (*Victor v. Nebraska* (1994) 511 U.S. 1, 6; *People v. Flores* (2007) 153 Cal .App.4th 1088, 1093.) Although it has no impact on our analysis and ultimate conclusion, we note that appellant appears to labor under the misapprehension that the appropriate question for determining whether error occurred is that articulated in *Cage, supra*, 498 U .S. at page 41, i.e., whether a reasonable juror could have interpreted the instruction(s) to allow a finding of guilt based on a degree of proof below that required by the due process clause. However, in *Estelle v. McGuire, supra*, 502 U.S. at page 72 and footnote 4, the Supreme Court made it clear that the proper inquiry is not whether the instruction could have been applied in an unconstitutional manner, but whether there is a reasonable likelihood the jury did so apply it. (See *Victor v. Nebraska, supra*, 511 U.S. at p. 6; *Boyde v. California* (1990) 494 U.S. 370, 380 (*Boyde*).) The court in *Sullivan* accepted the *Cage* standard as controlling because the state failed to challenge it below, and expressly declined to consider whether the instruction before it would have survived review under the *Boyde* standard. (*Sullivan, supra*, 508 U.S. at p. 278, fn. *.)

In the present case, appellant did not object to the trial court's comments. "[O]bjections to noninstructional statements or comments by the trial court must be raised at trial or are waived on appeal. [Citations.]." (*People v. Anderson* (1990) 52 Cal.3d 453,

468.) The trial court here was conducting voir dire, and nothing in the record suggests its comments were intended to be, or were understood by prospective jurors to be, a substitute for formal instructions. (See *People v. Avila* (2009) 46 Cal.4th 680, 716.)

Assuming the issue was not forfeited for appeal, the trial court made it clear that it was not equating its examples with the case. More importantly, the challenged comments were made not in the context of elaborating on the definition of reasonable doubt or explaining the standard or burden of proof, but instead were made in the course of the trial court's attempt to explain the use of circumstantial evidence to the particular prospective juror and to ascertain whether she would be able to deliberate. In fact, when the trial court defined proof beyond a reasonable doubt for prospective jurors and asked whether anyone had any quarrel with the standard, it explicitly stated that this was *not* the standard used in everyday life. The court stated: "Does anyone have any problems or quarrel with this being the standard or the rule of law in a criminal case? That's the standard you apply. You know, when you leave this room, that standard goes out the window, you know, you go decide what—you know, I'm going to buy a blue car or a red car, am I going to buy a Ford or a Chevy. I mean, maybe you do apply that standard, but you don't do that in everyday life; you know, low fat or one percent milk. You don't do that. Here, that's the standard in making a decision, and the burden is only on the People to prove that case beyond a reasonable doubt." Moreover, the court correctly and fully instructed the jury on the presumption of innocence and proof beyond a reasonable doubt both prior to the evidentiary portion of trial and prior to deliberations.

In light of the foregoing, *People v. Johnson (Glen), supra,* 119 Cal.App.4th at pages 980–981 and 985–986, and *People v. Johnson (Danny), supra,* 115 Cal.App.4th at pages 1171–1172, both of which found reversible error where, during jury selection, the trial court equated proof beyond a reasonable doubt with everyday decision-making in a juror's life, are legally and factually distinguishable. Moreover, were we to find some ambiguity or contradiction between the trial court's comments during voir dire and its formal instructions, in light of all the circumstances there would simply be no reasonable likelihood jurors applied the court's remarks in an unconstitutional manner. Accordingly, there was no violation of due process and, hence, no cause for reversal. (See *Victor v. Nebraska, supra,* 511 U.S. at p. 6; *Estelle v. McGuire, supra,* 502 U.S. at p. 72 & fn. 4.)

(Pet., Ex. A.)

The government must prove beyond a reasonable doubt every element of a charged offense. In re Winship, 397 U.S. 358 (1970). "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S.

1, 5 (1994).  The United States Supreme Court has held that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury."  Victor, 511 U.S. at 5.  A jury instruction that reduces the level of proof necessary for the Government to carry its burden "is plainly inconsistent with the constitutionally rooted presumption of innocence."  Cool v. United States, 409 U.S. 100, 104 (1972).  "All challenged instructions[, however,] must be considered in light of all of the jury instructions and the trial record as a whole." Mendez v. Knowles, 556 F.3d 757, 768 (9th Cir.2009), *citing* Cupp v. Naughten, 414 U.S. 141, 146–47 (1973).

Petitioner cites two state California cases for his argument that it is unconstitutional to compare the reasonable doubt standard to decisions in everyday life.  (Pet. 20-21).  See People v. Brannon, 47 Cal. 96, 97 (1873); People v. Johnson, 119 Cal. App. 4th 976, 982 (2004).  The standard for relief on a federal habeas petition is whether the state court's decision was contrary to clearly established federal law.  See Carey, 549 U.S. at 77; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.  Therefore, this Court cannot consider state law in determining whether to grant federal habeas relief.  See Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990).

Petitioner argues that the trial court's statement during jury selection about the reasonable doubt standard amounts to a structural error akin to Cage v. Louisiana, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990) disapproved of by Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  In Cage v. Louisiana, the United States Supreme Court held that the use of the words "grave" and "substantial" suggest a higher degree of doubt, and that when the court's instructions are "considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."  Id. at 41.  In Cage, although at one point the trial court instructed that to convict must be beyond a reasonable doubt, its incorrect statements were so egregious that they could not be corrected.  Id.

Petitioner argues that the trial court should have cured its error from jury selection, and that the error, in itself, amounts to structural error that requires reversal. While the trial court did not explicitly correct its misstatement to the jury, it instructed the jury during jury instructions that reasonable doubt was "not the standard used in everyday life." Petitioner also disputes that the jury was accurately instructed on the prosecution's burden of proof and the reasonable doubt standard. The court correctly instructed the jury on proof beyond a reasonable doubt and the presumption of innocence both prior to the evidentiary portion of the trial and prior to deliberations. (RT 897-80, 2033-34). The trial court stated after explaining the reasonable doubt standard, "That's the standard you apply. You know, when you leave this room, that standard goes out the window, you know, you go decide what—you know, I'm going to buy a blue car or a red car, am I going to buy a Ford or a Chevy. I mean, maybe you do apply that standard, but you don't do that in everyday life; you know, low fat or one percent milk. You don't do that." (Pet., Ex. A). Petitioner argues that the trial court again compared the reasonable doubt standard to decisions in everyday life in this statement. However, the trial court specifically stated that the reasonable doubt standard doesn't apply for everyday decisions such as which milk to purchase.

Moreover, it must be noted that the challenged comments by the trial court were made during voir dire. Once the venire was empaneled, the jurors were pre-instructed on the definition of reasonable doubt pursuant to CALCRIM No. 103. (RT 879-80). Then, at conclusion of presentation of the evidence, the jury was formally instructed on all applicable instructions, including again, the definition of reasonable doubt in CALCRIM No. 220. (RT 2033-34). Any possible erroneous statement made during voir dire could not have had a substantial and injurious effect on the verdict. See Brecht, 507 U.S. at 637-38.

It is true that the judge's reference to everyday decisions during jury selection comes close to improperly trivializing the reasonable doubt standard. However, the complained-of comments were not attempts by the trial court to describe the nature of reasonable doubt, but were its attempt to explain circumstantial evidence. When viewed in context, the court's comments did not significantly detract from or nullify the jury instruction on reasonable doubt.

1  Therefore, when taken as a whole, the trial court correctly conveyed the concept of reasonable

2  doubt to the jury.  The California Court of Appeal stated that there was no "reasonable likelihood

3  jurors applied the court's remarks in an unconstitutional manner" given the context of the

4  comments and the court's instructions on the reasonable doubt standard.  (Pet., Ex. A).

5      In sum, the state court rejection of Petitioner's claim was neither contrary to, nor an

6  unreasonable application of, clearly established law as established by the Supreme Court.  28

7  U.S.C. § 2254(d).  The claim must be rejected.

8      3. <u>Motion for New Trial</u>

9      Petitioner next alleges the trial court violated his rights to due process when it heard his

10  motion for a new trial following remand, because the judge was biased against him since he had

11  heard the prior motion for new trial, and the judge was biased against defense counsel.

12      This claim was presented on direct appeal to the Fifth District Court of Appeal and it was

13  denied in a reasoned decision.  The California Supreme Court denied review.  Federal courts

14  review the last reasoned state court opinion.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991).

15  Therefore, the Court must review the opinion of the Fifth District Court of Appeal.  In rejecting

16  Petitioner's claim, the appellate court stated as follows:

17      A.  Background

18      As previously described, upon remand, defendant filed a
    peremptory challenge to the trial judge pursuant to section 170.6.
19      The trial judge found the motion to have been timely filed, but
    denied it on the ground the proceedings before him did not
20      constitute a new trial, and so the statute did not permit
    disqualification. Defendant sought review by this court. In case
21      No. F062348, we denied his petition for a writ of mandate.

22      B.  Analysis

23      Section 170.3, subdivision (d) provides, in pertinent part: "The
    determination of the question of the disqualification of a judge is
24      not an appealable order and may be reviewed only by a writ of
    mandate from the appropriate court of appeal sought only by the
25      parties to the proceeding." A petition for writ of mandate under
    this section "provides the exclusive means for seeking review of a
26      ruling on a challenge to a judge, whether the challenge is for cause
    or peremptory. [Citations.]" (*People v. Panah* (2005) 35 Cal.4th
27      395, 444; *People v. Hull* (1991) 1 Cal.4th 266, 268, 271–276.)

28      Here, defendant sought timely review in this court of the denial of

30

his section 170.6 motion. We summarily denied his petition. "Defendant thus received the appellate review of his statutory claim to which he was entitled." (*People v. Panah, supra,* 35 Cal.4th at p. 445.) "Nevertheless, a defendant may assert on appeal a claim of denial of the due process right to an impartial judge. [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 811; *People v. Brown*(1993) 6 Cal.4th 322, 327, 332–335.) This is so where, as here, the defendant sought writ relief, as required by section 170.3, subdivision (d), and such relief was summarily denied.[15] (*People v. Brown, supra,* at p. 336.)

Relying on *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, the California Supreme Court has set out the legal principles applicable to review of a defendant's due process claim. "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge ... [that] is too high to be constitutionally tolerable." ' [Citation.]" (*People v. Freeman* (2010) 47 Cal.4th 993, 996.) "[A] constitutionally intolerable probability of actual bias exists only when the circumstances ' "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused." ' [Citations.] This inquiry is an objective one, based on whether ' "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias and prejudgment that the practice must be forbidden." ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 457.) The United States Supreme Court has "made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. [Citation.] Less extreme cases—including those that involve the mere appearance, but not the probability, of bias—should be resolved under the more expansive disqualification statutes and codes of judicial conduct. [Citation.]" (*People v. Freeman, supra,* 47 Cal.4th at p. 1005.)

Defendant says the standard required to show a due process violation has been met, because the trial judge was biased against defendant and defendant's trial attorney. Defendant points to several factors in support of this conclusion. None, alone or in combination, is persuasive.

Defendant first says the trial judge was "too piqued" by reversal of the judgment in the first appeal to carefully read this court's opinion, review *Porter, supra,* 47 Cal.4th 125, apprise himself of the standard to be used when hearing a motion under Penal Code section 1181, subdivision 6, and to use that standard. As we have already explained, however, the trial judge did not misunderstand his role in deciding defendant's motion, disregard the evidence favorable to the defense, lack familiarity with this court's opinion,

digress from the standard applicable to his decision on defendant's motion, or abuse his discretion by denying the motion. Nothing in the handling of the motion supports the charge of bias. (See *People v. Mayfield, supra,* 14 Cal.4th at p. 811.)

Defendant also says the trial judge was "too piqued," when the section 170.6 motion was presented, to correctly interpret *Peracchi v. Superior Court* (2003) 30 Cal.4th 1245 (*Peracchi*) and recognize his duty to recuse himself and allow another judge to consider the motion for a new trial or modification of the verdicts. We are not convinced the trial judge erred in his reading of the case.

The second paragraph of subdivision (a)(2) of section 170.6 provides, in pertinent part: "A motion under this paragraph may be made following reversal on appeal of a trial court's decision, or following reversal on appeal of a trial court's final judgment, if the trial judge in the prior proceeding is assigned to conduct a new trial on the matter." At issue in *Peracchi* was whether a sentencing hearing conducted on remand after a partial reversal on appeal constituted a "new trial" within the meaning of the statute. (*Peracchi, supra,* 30 Cal.4th at p. 1253.) In addressing the question, the California Supreme Court observed that Penal Code section 1179 defines a new trial as " 'a reexamination of the issue in the same Court, before another jury, after a verdict has been given,' " while Penal Code section 1180 explains that " '[t]he granting of a new trial places the parties in the same position as if no trial had been had.' " (*Peracchi, supra,* 30 Cal.4th at p. 1253.) The court concluded: "Taking into consideration the applicable statutes, prior court practice, the function of a sentencing hearing, and the limited effect on the judgment of a reviewing court's order remanding for resentencing, we conclude that resentencing is not a 'new trial' within the meaning of the Penal Code or Code of Civil Procedure section 170.6." (*Id.* at pp. 1257–1258, fn. omitted.)

*Peracchi* recognized that a remand for resentencing is not equivalent to an order for a new trial (*Peracchi, supra,* 30 Cal.4th at p. 1254), and that when remanding for resentencing, a reviewing court typically does not reverse the judgment of conviction or remand for a new trial (*id.* at p. 1255). In defendant's case, of course, we *did* reverse the judgment. We did not, however, necessarily remand for a new trial, but rather gave the trial judge the option of reinstating the judgment and sentence. Under the circumstances, we cannot agree with defendant's position that, because a Penal Code section 1181, subdivision 6 motion is a prerequisite to a retrial, it must be treated the same as a retrial for section 170.6 purposes. A motion for a new trial is not a new trial; a remand for a new hearing on a motion for new trial is not, without more, a remand for a new trial itself. Our disposition in defendant's prior appeal simply did not place the parties in the same position as if there had been no trial. Accordingly, we conclude *Peracchi* 's reasoning applies, and the trial judge properly denied defendant's peremptory challenge pursuant to section 170.6.

Last, defendant says the trial judge's bias against defense counsel was demonstrated in defendant's petition for writ of mandate

challenging Judge Chittick's denial of the challenge for cause brought pursuant to section 170.1. Apparently this court disagreed that bias was shown, since it denied defendant's petition. In any event, we have reviewed Judge Chittick's ruling, and conclude it correctly found no basis in the facts presented for a finding of bias or prejudice, and that no reasonable reading of the evidence presented could lead one to believe the trial judge was not impartial. (See *People v. Carter* (2005) 36 Cal.4th 1215, 1243.) The trial judge's comment to defense counsel, made in the course of an attempt to accommodate the attorneys' schedules while also selecting a jury, that she was a "big girl" who could have renewed her driver's license the previous week rather than waiting until the week she had a murder trial assigned, was unfortunate, but, considered in context, not indicative of bias. (Contrast *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1497, 1499–1501 & fn. 5 [trial court's oral statement of decision "so replete with gender bias" that appellate court "forced" to conclude wife did not receive fair trial], disapproved on another ground in *People v. Freeman, supra,* 47 Cal.4th at p. 1006, fn. 4.) Likewise, telling counsel she had to object in good faith and instructing her not to waste the court's time with a particular type of objection do not indicate prejudice or bias when considered in context.

To summarize, the circumstances of this case "simply do not rise to a due process violation under the standard set forth by *Caperton* because, objectively considered, they do not pose ' "such a risk of actual bias or prejudgment" ' [citation] as to require disqualification." (*People v. Freeman, supra,* 47 Cal.4th at p. 1006, fn. omitted; see also *People v. Carter, supra,* 36 Cal.4th at p. 1244.) Accordingly, defendant's claim fails.

(Pet. Ex. B).

Here, Petitioner argues that the trial judge should have recused himself based on his participation in the prior motion for a new trial, and relies on Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 880 (2009), which holds that judges may need to recuse themselves based on participation in a prior proceeding. While a judge may need to recuse himself from a matter, the determination should be based on an objective basis. See id. "The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Caperton, 556 U.S. at 881. In Caperton, a state supreme court justice who had received significant contributions for his campaign for office from the litigant was required to recuse himself from that litigant's case. Id. at 886-87. The United States Supreme Court noted that the litigant's "significant and disproportionate influence – coupled with the temporal relationship between the election and the

1  pending case– " ' "offer a possible temptation to the average…judge to…lead him not to hold the
2  balance nice, clear and true." ' " <u>Id.</u> (internal citations omitted).

3      Petitioner also argues that the trial judge should have recused himself based on <u>In re</u>
4  <u>Murchison</u>, 349 U.S. 133, 136 (1955).  In <u>Murchison</u>, the Supreme Court held that a judge who
5  cannot be "wholly disinterested" in the proceedings and anytime there is the "probability of
6  fairness" should not preside over a matter.  349 U.S. at 136-37.  The trial judge in Murchison had
7  acted as a "one-man grand jury" by examining witnesses to determine whether criminal charges
8  should be brought and then charging the petitioners.  <u>Id.</u> at 133-35.

9      There is no evidence in the record that the judge was biased against Petitioner or his
10  attorney.  Petitioner argues that the judge's opinion of him and his attorney was tainted by the
11  prior motion for a new trial, resulting in unfairness in the motion for new trial after remand.
12  However, Petitioner is unable to point to anything in the record to support this claim.

13      The judge's comments to defense counsel do not indicate prejudice or bias.  While the
14  judge told counsel to be a "big girl," they were in reference to her scheduling the renewal of her
15  driver's license, and do not rise to the level of bias or prejudice.  The judge had told counsel that
16  she had to object in good faith and not to waste the court's time with a particular type of
17  objection, but when viewed in context, they do not indicate prejudice or bias.  The remarks by
18  the judge that Petitioner contends are evidence of bias are merely impatient remarks.  Impatient
19  remarks, including ones that are "critical or disapproving of, or even hostile to, counsel, the
20  parties, or their cases," are insufficient to overcome the presumption of judicial integrity.  <u>See</u>
21  <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1067 (9th Cir 2008) (quoting <u>Liteky v. United States</u>, 510
22  U.S. 540, 555, 114 S.Ct. 1147 (1994)).

23      Petitioner also raises the issue that the trial judge said that he would not be able to preside
24  over a new trial, but then he presided over the motion for new trial on remand.  Pursuant to Code
25  of Civil Procedure section 170.6, the trial judge would have had to recuse himself if a new trial
26  was conducted after an appellate court reversed the judgment.  Therefore, the trial judge's
27  statement about not being able to preside over a new trial on remand was a correct statement that
28  did not have any impact on his ability to preside over the motion for a new trial after the

judgment was reversed by the appellate court.

Thus, the state court did not unreasonably apply Supreme Court authority or make an unreasonable determination of fact in making its determination, and this claim fails.

### 4. Self-Defense and Related Instructions

Petitioner alleges that the trial court's failure to instruct on the amount of allowable force, sudden quarrel/heat of passion, and absence of malice constituted prejudicial error that deprived him of his right to present a defense. This claim was presented on direct appeal to the Fifth District Court of Appeal and it was denied in a reasoned decision. Petitioner raised this issue in his state habeas petition to the California Supreme Court where he raised substantive evidentiary claims and an ineffective assistance of appellate counsel claim. Federal courts review the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). Therefore, the Court must review the opinion of the Fifth District Court of Appeal. In rejecting Petitioner's claim, the appellate court stated as follows:

#### A. Amount of Allowable Force

#### 1. Background

Appellant claimed he was not guilty of any crime because, at the time he fired his gun, he was acting reasonably in self-defense. In support, and as described in the statement of facts, *ante*, appellant testified that, inter alia, because of the injuries he received when he was 15 years old, he was told that if he was hit too hard in the head or eye, he could lose his eye and possibly his life. During the confrontation, although it appeared none of the others were armed, appellant felt in danger and did not want to be put back in a situation of being hurt again. Appellant also presented evidence that he suffered from PTSD caused primarily by the beating, and that core symptoms of PTSD were avoidance and hypervigilence, i.e., a sense of potential threat when confronted with things that recalled the traumatic event. In Dr. Howsepian's opinion, appellant's history of being traumatized, together with the circumstances of the confrontation in the present case, added up to an individual who perceived the threat in an amplified way and felt the need to act quickly to save himself.

The People and appellant both requested that the trial court give the jury CALCRIM No. 505 (justifiable homicide: self-defense or defense of another). Appellant also requested CALCRIM No. 3470 (right to self-defense or defense of another (nonhomicide)). The trial court agreed the instructions would be given as requested. Pursuant to CALCRIM No. 505, the court subsequently instructed the jury, in pertinent part:

"The defendant is not guilty of murder if he was justified in killing someone in selfdefense. The defendant acted in lawful self-defense if:

"One, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury.

"Two, the defendant reasonably believed ... that the immediate use of deadly force was necessary to defend against that danger.

"And three, the defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The defendant's belief that he was threatened may be reasonable even if he relied on information that that was not true. However, the defendant must actually and reasonably have believed – the defendant must actually and reasonably have believed that the information was true. [¶] ... [¶]

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder."

Appellant now contends the trial court erred by instructing jurors that a "defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation," and that the error was exacerbated by the trial court's omission of the following optional portions of CALCRIM No. 505:

"[Someone who has been threatened or harmed by a person in the past, is justified in acting more quickly or taking greater self-defense measures against that person.]

"[If you find that the defendant received a threat from someone else (he/she) reasonably associated with _____ < insert name of decedent/victim >, you may consider that threat in deciding whether the defendant was justified in acting in (selfdefense/[or] defense of another).]"

Appellant says the group confronting him in 2007 was, in his mind, much like and, thus, closely associated with the group that confronted him in 2004; hence, he was justified in acting more quickly and taking harsher measures for self-protection than persons who had not been beaten in the past. The jury, he says, was led to believe the opposite was true. While the trial court correctly told jurors they should take into consideration appellant's individual circumstances when determining whether his beliefs were reasonable, appellant contends, the court barred the jury from considering those circumstances when determining whether appellant's actions were reasonable.

**2. Analysis**

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.] As the Legislature has stated, '[T]he circumstances must be sufficient to excite the fears of a reasonable person....' [Citations.] Moreover, for either perfect or imperfect selfdefense, the fear must be of imminent harm. 'Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury.' [Citation.]

"Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge....' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant....' [Citation.] To do this, it must consider all the ""facts and circumstances ... in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety.""' [Citation.] As [the California Supreme Court] stated long ago, '... a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind....' [Citation.]" (People v. Humphrey (1996) 13 Cal.4th 1073, 1082–1083, italics & fn. omitted (Humphrey).)

Appellant's claim of error turns on the meaning of "reasonable" and the effect of his PTSD and prior experiences in that regard. This is because, "[a]lthough the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found [him]self." (Humphrey, supra, 13 Cal.4th at p. 1083.) Moreover, "any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]"

(*People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved on another ground in *People v. Williams, supra,* 49 Cal.4th at p. 459; see also *People v. Hardin* (2000) 85 Cal.App.4th 625, 629–630.)

Although not cited by either party, *People v. Jefferson* (2004) 119 Cal.App.4th 508 (*Jefferson* ) is very instructive. In that case, the defendant was convicted of three counts of battery upon correctional officers, committed while he was incarcerated in a prison psychiatric services unit.(*Id.* at pp. 510, 511.)There was evidence that he had mental disabilities, including possibly schizophrenia, and that he was hearing voices when the offenses were committed. (*Id.* at pp. 513–514.)On appeal, he claimed the trial court failed to account for his mental illness when, inter alia, instructing on his defense of self-defense and ruling on the admissibility of certain evidence. (*Id.* at p. 510.)

The appellate court disagreed and affirmed the judgment. (*Jefferson, supra,* 119 Cal.App.4th at p. 510.)It rejected the defendant's argument that, for purposes of applying, in the defendant's case, the "reasonable person" test as stated in *Humphrey,* a reasonable person was one who was confined in a prison's psychiatric services unit, and that evidence of the conditions of confinement, including his mental illness, should be considered by the jury to determine whether the defendant had reasonable grounds for a genuine belief that he was in imminent danger. (*Jefferson,* at p. 518.)The court explained:

"Defendant misstates the objective 'reasonable person' test. The issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger. The issue is whether a 'reasonable person' in defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger....

"By definition, a reasonable person is not one who hears voices due to severe mental illness. In blunt fashion, our Supreme Court long ago defined a reasonable person as a 'normal person.' [Citation.] The reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him to be. [Citations.]"(*Id.* at p. 519.)

The appellate court deemed erroneous the defendant's claim that *Humphrey* required the admission of his mental condition as part of establishing the reasonable person standard. The court stated:

"Nowhere did the *Humphrey* court state the expert evidence could be used to redefine the 'reasonable person' standard as one who suffered from battered women's syndrome or, as defendant argues here, one who suffered from hearing voices.

"To the contrary, the Supreme Court stated: '[W]e are not changing the standard from objective to subjective, or replacing the reasonable "person" standard with a reasonable "battered woman" standard.... The jury must consider defendant's situation and

knowledge, which makes the evidence relevant, but the ultimate question is whether a reasonable *person,* not a reasonable battered woman, would believe in the need to kill to prevent imminent harm. Moreover, it is the *jury,* not the expert, that determines whether defendant's belief and, ultimately, her actions, were objectively reasonable.'[Citation.]" (*Jefferson, supra,* 119 Cal.App.4th at p. 520.)

The appellate court observed that the jury knew the defendant was an inmate in a prison psychiatric services unit, heard voices every day telling him the staff was poisoning his food and, before each incident, that the correctional officers were going to hurt him, and that the defendant believed he had no choice but to follow the voices and do what he did. The jury also knew the facts of the incidents, including that there was no evidence of any attempt by, or intent of, the officers to harm the defendant. The court concluded: "The jury thus had before it all of the relevant facts and circumstances in which defendant found himself. The trial court correctly denied defense counsel's efforts to define the reasonable person as a mentally ill person hearing voices. Under the rule of *Humphrey,* the jury was to determine whether a person of ordinary and normal mental and physical capacity would have believed he was in imminent danger ... under the known circumstances. The jury was so instructed, and defendant was not denied the opportunity to present his defense in the manner allowed by law."(*Jefferson, supra,* 119 Cal.App.4th at p. 520.)

In the present case, the jury was instructed that appellant was entitled to use the amount of force a reasonable person would believe was necessary *in the same situation.*The "same situation" consists not only of the state of affairs confronting appellant, but also his own specific situation, including any mental and physical issues. The jury was aware of all the relevant circumstances. Since, following *Jefferson's* logic, a "reasonable person" is not a "reasonable PTSD sufferer," the trial court did not misstate the amount of force appellant was entitled to use.

Nor did the trial court err by omitting the optional portions of CALCRIM No. 505 that referred to prior threats and harm. First, as this court held in *People v. Garvin* (2003) 110 Cal.App.4th 484, 488–489 (*Garvin* ), a trial court has no obligation to instruct on antecedent threats or assaults on its own motion. CALCRIM No. 505, as given, instructed the jury on the basic principles of self-defense; if appellant felt it was incomplete, he was required to request the additional material. (*People v. Welch* (1999) 20 Cal.4th 701, 757; see *People v. Young* (2005) 34 Cal.4th 1149, 1200.)That the omitted paragraphs are now contained in a unified instruction instead of in multiple instructions as was the case in the CALJIC scheme discussed in *Garvin* does not turn paragraphs that "highlight[ ] a particular aspect of this defense and relate[ ] it to a particular piece of evidence" (*Garvin, supra,* 110 Cal .App.4th at p. 489) into general principles of law upon which a trial court must instruct sua sponte (see *People v. Daya* (1994) 29 Cal . App.4th 697, 714). Indeed, the Bench Notes to CALCRIM No. 505 state that the trial court must instruct on antecedent threats and assaults

upon defense request and when supported by sufficient evidence. (Bench Notes to CALCRIM No. 505 (2009–2010) p. 237.)

Second, even if we assume appellant requested that instructions on antecedent threats and assaults be given, the instructions were properly omitted here. "The jury need not be instructed on a theory for which no evidence has been presented. [Citation.]" (*People v. Roberts* (1992) 2 Cal.4th 271, 313; see also *People v. Hill* (2005) 131 Cal.App.4th 1089, 1101, disapproved on another ground in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5.) Cases holding that a defendant is entitled to such instructions all involve the making of prior threats or commission of harm *by the victim* (e.g., *People v. Moore* (1954) 43 Cal.2d 517, 527–529; *People v. Pena* (1984) 151 Cal.App.3d 462, 475, 476–477; *People v. Bush* (1978) 84 Cal.App.3d 294, 304; *People v. Torres* (1949) 94 Cal.App.2d 146, 151) or by third parties the defendant *reasonably associated with the victim* (e.g., *People v. Minifie* (1996) 13 Cal.4th 1055, 1060, 1065–1067 (*Minifie* )).

Appellant cites *Minifie* in support of his assertion that the group confronting him in 2007 was much like, and thus closely associated with, the group that confronted him in 2004. However, *Minifie* involved a situation in which the threats were made by friends and cohorts of a man the defendant previously killed. The victim of the charged offenses was a friend of the deceased. (*Minifie, supra,* 13 Cal.4th at pp. 1060–1061, 1063–1064.)Nothing in the opinion suggests the requisite association may exist only in the defendant's mind. Even the Salman Rushdie example that is given requires the defendant to *reasonably* associate the victim with the threats. While what is reasonable will vary according to the circumstances, the association addressed in *Minifie* is not the type of "association" that existed in appellant's mind due to his traumatic memory of a prior assault by a completely unrelated group. Moreover, evidence of appellant's previous experiences was before jurors, who were sufficiently instructed on the issue when told to consider *all* the circumstances as they were known to *and appeared to* appellant, and to consider what a reasonable person *in a similar situation with similar knowledge* would have believed.

Appellant says remarks made by the trial court during jury selection likely increased the harm done by the instructional error. We find no instructional error. Moreover, in each instance, the court was discussing the importance of this country's jury system and jury service. We fail to see how its remarks in this regard could have had any possible effect on jurors' interpretation of the evidence or the instructions, or how, as asserted by appellant, they led jurors to erroneously suppose they should hold appellant to an objective standard and not consider his experiences or history in deciding issues related to self-defense.

**B. *Sudden Quarrel/Heat of Passion***

**1. *Background***

Evidence was presented that appellant was angry during his

argument with Daniels's group. Appellant himself testified that the accusation he stole the PlayStation did not make him angry, but instead surprised him. As the argument continued, however, he started "getting irritated a little bit...." He explained: "I had my words, I got irritated and may have got a little angry, but not to where I lost my cool."When the prosecutor asked whether, at the time he was shooting, appellant was "still keeping [his] cool," appellant responded that he was trying to protect himself. When the prosecutor asked if he still knew what he was doing, appellant responded, "Yeah." Appellant subsequently testified that he got angry, but was trying to be as cool as possible. While he was mad, he raised the gun and asked the group to leave. Appellant testified:

"Q. [by the prosecutor] Okay. And you pulled the trigger of the gun and fired into the crowd when you were mad; correct?

"A. Yes. And out of fear.

"Q. But you didn't lose your cool, you knew what you were doing; right? [¶] ... [¶]

"A. I felt I was protecting myself, yes."

During the on-the-record instructional conference, the court ran through the list of instructions it would be giving. This ensued:

"[THE COURT:] [CALCRIM No.] 571, voluntary manslaughter, imperfect self-defense, lesser-included offense. That is, again 571. That will be given as requested.

"MR. FRANCIS: And I'd note for the record, Your Honor, that in our previous discussions of this, there was no request by the defense for a voluntary manslaughter, other than the type of imperfect self-defense that we have here.

"THE COURT: Okay. And are you requesting that, Ms. Boulger?

"MS. BOULGER: I'm only requesting the instructions I have submitted formally, Your Honor.

"THE COURT: So—let me see.

"MS. BOULGER: It would be nothing other than the 571....

"THE COURT: You didn't request 571.

"MS. BOULGER: Oh, yeah. I'm only going with—
"THE COURT: So double check.

"MS. BOULGER: I'm going with an acquittal, Your Honor, that's what we're going for.

"THE COURT: Okay. So you are requesting 571?

"MS. BOULGER: We'll take it. But I'm not requesting anything

else.

"THE COURT: Well, don't—don't say that 'cuz you just said that and you're wrong.

"MS. BOULGER: Well, I'm—I'm saying—he suggested that I was asking for another theory of manslaughter. And I am not. In fact, I—we are—our—our theory is it's not manslaughter."

Jurors subsequently were instructed on voluntary and attempted voluntary manslaughter based on imperfect self-defense. They were not instructed, however, on voluntary or attempted voluntary manslaughter based on sudden quarrel or heat of passion (CALCRIM Nos. 570 & 603, respectively). Appellant now contends omission of these instructions constituted reversible error.

**2.** *Analysis*

Manslaughter is a lesser included offense of murder. (*People v.. Cruz* (2008) 44 Cal.4th 636, 664.)It follows that attempted voluntary manslaughter is a lesser included offense of attempted murder, although, unlike murder and voluntary manslaughter, which can be predicated on either intent to kill or conscious disregard for life (*People v. Lasko* (2000) 23 Cal.4th 101, 107–109), attempted murder and attempted voluntary manslaughter require a specific intent to kill (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1549–1550).

"A criminal defendant is entitled to an instruction on a lesser included offense only if [citation] 'there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' [citation], but not the lesser. [Citations.]" (*People v. Memro* (1995) 11 Cal.4th 786, 871, italics omitted.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could ... conclude[ ]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

An appellate court reviews independently a trial court's failure to instruct on a lesser included offense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)Although speculation is an insufficient basis upon which to require such an instruction (*People v. Valdez* (2004) 32 Cal.4th 73, 116), in determining whether there is substantial evidence of a lesser offense, courts do not evaluate the credibility of witnesses, as that is a task for the jury (*People v. Breverman, supra,* 19 Cal.4th at p. 162). The testimony of a single witness, including the defendant, can constitute substantial evidence requiring the trial court to instruct on its own initiative. (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

The parties argue over whether any error here was invited. "[T]he

sua sponte duty to instruct on lesser included offenses ... arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued."(*People v. Breverman, supra,* 19 Cal.4th at p. 162.)Nevertheless, "a defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence. [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 198.)Although the error is still error, it does not furnish cause for reversal. (*Ibid.*)

Whether error is invited turns on whether counsel deliberately caused the court to fail to fully instruct. (*People v. Cooper* (1991) 53 Cal.3d 771, 831.)Accordingly, "the record must show only that counsel made a conscious, deliberate tactical choice between having the instruction and not having it."(*Ibid.*) Although here defense counsel clearly had a tactical purpose for wanting only those instructions she had requested, which did not include instructions on sudden quarrel and heat of passion (see *People v. Horning* (2004) 34 Cal.4th 871, 905), we cannot say she would have opposed the giving of such instructions if offered, inasmuch as she accepted the giving of instructions on imperfect self-defense even though she had not requested them. Under the circumstances, we question whether the doctrine of invited error applies. (See *People v. Cooper, supra,* 53 Cal.3d at p. 831.)

We need not determine whether any error was invited, however, because we conclude the instructions were properly omitted. As the California Supreme Court explained in *People v. Manriquez* (2005) 37 Cal.4th 547, 583–584:

" 'Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " [Citation.]' [Citation.]

"Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago ..., "this heat of passion must be such a passion as would naturally be

aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citations.]"

" ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' [Citation.]" (*People v. Manriquez, supra,* 37 Cal.4th at p. 584.)Because the circumstances giving rise to the heat of passion are viewed objectively, a defendant's " 'extraordinary character and environmental deficiencies,' " including "psychological dysfunction due to traumatic experiences," are irrelevant to the inquiry. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252, 1253.)

"[A] voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing [or attempted killing] was no more than taunting words, a technical battery, or slight touching. [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.)Neither does simple assault rise to the level of provocation necessary to support such an instruction. (*Id.* at p. 827.)"The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment."(*People v. Lee* (1999) 20 Cal.4th 47, 60 (plur. opn. of Baxter, J.).) An argument with unarmed acquaintances with whom there had apparently been no trouble in the past, even one occurring in one's own home and involving accusations of theft, the use of profanity and name-calling, and individuals who were slow to leave when told to do so, is not provocation that would incite an average, sober person to homicidal passion. (Compare *People v. Breverman, supra,* 19 Cal.4th at pp. 163–164 [sufficient provocation where group of young men, armed with deadly weapons and harboring specific hostile intent, trespassed on domestic property occupied by defendant, acted in menacing manner and challenged him to fight, and used weapons to smash defendant's vehicle that was parked in driveway not far from front door]; *People v. Barton, supra,* 12 Cal.4th at p. 202 [sufficient provocation where victim tried to run defendant's daughter's car off road and spat on it; when confronted by defendant, victim acted " 'berserk' " and assumed fighting stance; when defendant asked daughter to call police, argument escalated and victim taunted defendant, and defendant thought victim was armed with knife]; *People v. Elmore* (1914) 167 Cal. 205, 211 [sufficient provocation where fatal wound inflicted in response to "unprovoked attack and violent blows" of victim].)

Moreover, adequate provocation *and* heat of passion must be affirmatively shown. (*People v. Gutierrez, supra,* 34 Cal.4th at p. 826; *People v. Steele, supra,* 27 Cal.4th at p. 1252.)" 'It is not enough that provocation alone be demonstrated. There must also be evidence from which it can be inferred that the defendant's reason *was in fact obscured* by passion at the time of the act.

[Citations.]' " (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1015, italics added.) Although appellant was undisputedly angry and, according to at least some evidence, fearful, his own testimony was that he did not lose "his cool" and act rashly, or without due deliberation and reflection, or from strong passion rather than judgment. (See *People v. Moye* (2009) 47 Cal.4th 537, 540.)While jurors were free to disbelieve appellant's testimony, the circumstances shown by the evidence at trial were not such as to constitute substantial evidence of heat of passion despite appellant's testimony. (Compare *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52–53 [jurors could have found intentional shooting in self-defense or imperfect self-defense, despite defendant's testimony he shot victim accidentally, where defendant begged victim to leave and only fired after victim stepped on accelerator in apparent attempt to run defendant over]; *People v. Elize* (1999) 71 Cal.App.4th 605, 610 [jurors could have disbelieved defendant's testimony that he fired accidentally, and concluded instead that he fired intentionally to stop physical attack].)

Last, assuming the trial court erred by failing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion, the error was harmless. Pursuant to CALCRIM No. 522, jurors were told that if they found provocation, they were to consider it in determining whether the crime was first or second degree murder, and whether it was murder or manslaughter. Despite this instruction and one telling jurors that the People had the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime, jurors found Daniels's killing to be deliberate, premeditated murder. Under the instructions given, they necessarily found appellant "carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill." They thus necessarily rejected the notion appellant's reason was obscured. (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [state of mind required for premeditated murder is " 'manifestly inconsistent' " with having acted under heat of passion, even if provocation present]; *People v. Manriquez, supra,* 37 Cal.4th at p. 586; *People v. Lewis, supra,* 25 Cal.4th at p. 646.)

Although there was no charged allegation or finding of premeditation with respect to the attempted murders, in light of the evidence presented and instructions given, it is not reasonably probable jurors would have found premeditation with respect to appellant's shooting of one victim, but voluntary manslaughter based on sudden quarrel or heat of passion with respect to his shooting of or at the other victims. Accordingly, the failure to instruct, assuming it was error, was harmless. (See *People v. Breverman, supra,* 19 Cal.4th at p. 178 [applying *Watson* standard to failure to instruct on lesser included offense in noncapital case].)

### C. *Malice*

Appellant says that, even if the trial court's error in failing to instruct on voluntary manslaughter and attempted voluntary

manslaughter based on sudden quarrel or heat of passion was invited, the court had a sua sponte duty to tell jurors that there was no malice and, hence, no murder or attempted murder, if the killing and attempted killings occurred upon a sudden quarrel or in the heat of passion. He says that because the existence of malice, which is required for murder and attempted murder, depends on the *absence* of sudden quarrel and heat of passion, such absences are included within malice as an essential element of murder, and the jury must find that element true in order to reach a murder or attempted murder verdict. Under the instructions given here, the argument runs, the jury was permitted to treat required elements as irrelevant and allowed to reach verdicts of murder and attempted murder without considering or finding requisite elements of the offenses.

Heat of passion and unreasonable self-defense, as forms of manslaughter, a lesser offense included in murder, come within the broadest version of a trial court's duty, under California law, to produce sua sponte instructions on all material issues presented by the evidence. (*People v. Breverman, supra,* 19 Cal.4th at pp. 159–160.)In light of our conclusion, *ante,* that either the trial court did not err by omitting instructions on sudden quarrel/heat of passion or that any error was harmless under both the *Watson* and *Chapman* standards, however, appellant's argument fails. The trial court instructed jurors that the prosecutor had the burden of proving, beyond a reasonable doubt, that, with respect to count 1, appellant acted with malice and, with respect to the remaining counts, that he intended to kill. This was sufficient under the circumstances of this case.

*People v. Rios* (2000) 23 Cal.4th 450 (*Rios* ), on which appellant relies, does not lead to a different result. In that case, the California Supreme Court held that, while neither heat of passion nor imperfect self-defense is an element of voluntary manslaughter that the People must prove beyond a reasonable doubt in order to obtain a conviction for that offense, "where murder liability is at issue, evidence of heat of passion or imperfect self-defense bears on whether an intentional or consciously indifferent criminal homicide was malicious, and thus murder, or nonmalicious, and thus the lesser offense of voluntary manslaughter. In such cases, the People may have to prove the *absence* of provocation, or of any belief in the need for self-defense, in order to *establish* the *malice element of murder.*" (*Id.* at p. 454.)The court referred to sudden quarrel/heat of passion and imperfect self-defense as "mitigating circumstances" that reduce an intentional, unlawful killing for murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide. (*Id.* at pp. 460–461.)It stated:

"Thus, where the defendant killed intentionally and unlawfully, evidence of heat of passion, or of an actual, though unreasonable, belief in the need for self-defense, is relevant only to determine whether malice has been established, thus allowing a conviction of murder, or has not been established, thus precluding a murder conviction and limiting the crime to the lesser included

46

offense of voluntary manslaughter. Indeed, in a murder case, unless the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger, it is the defendant's obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder. [Citations.]

"If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case [citation], the People must prove beyond reasonable doubt that these circumstances were lacking in order to establish the murder element of malice. [Citations.]"(*Id.* at pp. 461–462, italics omitted.)

The court reiterated: "[I]n a murder trial, the court, on its own motion, must fully instruct on every theory of a lesser included offense, such as voluntary manslaughter, that is supported by the evidence. [Citation.] Hence, where the evidence warrants, a murder jury must hear that provocation or imperfect self-defense negates the malice necessary for murder and reduces the offense to voluntary manslaughter. By the same token, a murder defendant is not *entitled* to instructions on the lesser included offense of voluntary manslaughter if evidence of provocation or imperfect self-defense, which would support a finding 'that the offense was less than that charged,' is lacking. [Citations.]" (*Rios, supra,* 23 Cal.4th at p. 463, fn. 10.)

In the present case, the jury was instructed on the People's burden of proving the absence of imperfect self-defense. Because evidence of sudden quarrel or heat of passion sufficient to support a finding of voluntary manslaughter was lacking, the trial court had no sua sponte duty to instruct the jury on the People's burden of proving that provocation and heat of passion were lacking. Moreover, even if we were to find that error occurred, it would be harmless for the reasons stated in part IV.B., *ante.*(See *Neder v. United States* (1999) 527 U.S. 1, 19; *People v. Flood* (1998) 18 Cal.4th 470, 489–490, 502–503; *People v. Tillotson* (2007) 157 Cal.App.4th 517, 538–539.)

(Pet., Ex. A).

Petitioner alleges his Sixth Amendment right to present a defense was violated when the trial court failed to instruct the jury on the amount of allowable force, sudden quarrel/heat of passion, and the absence of malice.

In this case, Petitioner fails to demonstrate that the trial court's failure was contrary to or an unreasonable application of Supreme Court precedent. Respondent argues that the state court's determination that the jury was correctly instructed on the challenged instructions was an interpretation of state law. The Court notes that any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas

1  relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991) (citing Marshall v. Lonberger, 459 U.S. 422,

2  438, n. 6 (1983)) ("[T]he Due Process Clause does not permit the federal courts to engage in a

3  finely tuned review of the wisdom of state evidentiary rules").  "'Failure to give [a jury]

4  instruction which might be proper as a matter of state law,' by itself, does not merit federal

5  habeas relief."  Menendez v. Terhune, 422 F.3d 1012, 1029 (quoting Miller v. Stagner, 757 F.2d

6  988, 993 (9th Cir. 1985)).

7        The only basis for federal collateral relief for instructional error is that the infirm

8  instruction or the lack of instruction by itself so infected the entire trial that the resulting

9  conviction violates due process.  See Estelle, 502 U.S. at 72 (citations omitted).  This court must

10  evaluate the challenged instruction in the context of the instructions as a whole and the entire

11  trial record.  Estelle, 502 U.S. at 72.  The burden on Petitioner is especially heavy "where ... the

12  alleged error involves the failure to give an instruction."  Clark v. Brown, 450 F.3d 898, 904 (9th

13  Cir. 2006).  Even if constitutional instructional error has occurred, the federal court must still

14  determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial

15  and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507

16  U.S. 619, 637 (1993).  A "substantial and injurious effect" means a "reasonable probability" that

17  the jury would have arrived at a different verdict had the instruction been given.  Clark, 450 F.3d

18  at 916.

19        The Sixth Amendment right to a fair trial requires that criminal defendants be afforded a

20  meaningful opportunity to present a complete defense.  California v. Trombetta, 467 U.S. 479,

21  485 (1984).  In Mathews v. United States, 485 U.S. 58, 63 (1988), the Supreme Court held that

22  "a defendant is entitled to an instruction as to any recognized defense for which there exists

23  evidence sufficient for a reasonable jury to find in his favor."  Federal courts have held that a

24  trial court's failure to give a requested instruction embodying the defense theory of the case and

25  around which the defendant had built his or her defense violates the defendant's due process right

26  to present a complete defense.  See, e.g., Clark v. Brown, 442 F.3d 708, 713–718 (9th Cir.2006)

27  (instruction on felony-murder special circumstance); Bradley v. Duncan, 315 F.3d 1091, 1098-99

28  (9th Cir.2002) (instruction on defense of entrapment); Conde v. Henry, 198 F.3d 734, 739–740

1   (9th Cir.2000) (instruction on simple kidnapping as lesser included offense of kidnapping for

2   robbery); United States v. Monger, 185 F.3d 574, 576–577 (6th Cir.1999) (instruction on lesser

3   included offense).

4         In all of these cases, however, the instruction at issue was requested by the defense.

5   Respondent argues that by Petitioner not requesting these jury instructions during trial, he

6   foreclosed any federal habeas relief, because there is no clearly established Supreme Court

7   precedent that there is a *sua sponte* instructional duty on trial judges.  Petitioner counters that he

8   did, in fact, request CALCRIM No. 505.  Petitioner claims that he requested an instruction on the

9   omitted language of CALCRIM No. 505, and he never agreed to cut any portions of it.  The Fifth

10   Appellate District noted, "the People and appellant both requested that the trial court give the

11   jury CALCRIM No. 505…"  (Pet., Ex A).  It is true that both parties requested CALCRIM No.

12   505, but it appears that defense counsel did not request the optional prior threats and harm

13   instruction, as she did not request it during the discussion on jury instructions and she did not

14   object when the instruction was read to the jury.  (RT 1998; RT 2044-2046).  Defense counsel

15   also did not request the sudden quarrel/heat of passion instruction, and in fact, specifically stated

16   that the defense was not requesting another theory of manslaughter besides CALCRIM No. 571.

17   (RT 1998-2000).  Thus, the trial court did not instruct on voluntary or attempted voluntary

18   manslaughter based on sudden quarrel or heat of passion.  (CALCRIM Nos. 570 & 603).

19         Therefore, Petitioner's complaint amounts to an assertion that the trial court failed to *sua*

20   *sponte* instruct the jury on allowable force, sudden quarrel/heat of passion, and absence of malice

21   as a defense.  But the above-noted cases do not support the proposition that a trial court's *sua*

22   *sponte* failure to instruct denies due process.  In fact, the Supreme Court has not clearly

23   established that a trial court is required under the Constitution to issue a defense instruction *sua*

24   *sponte*.  The Supreme Court has stated that "[i]t is the rare case in which an improper instruction

25   will justify reversal of a criminal conviction when no objection has been made in the trial court."

26   Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  Since there is no clearly established Federal law

27   requiring such a *sua sponte* instruction, this Court cannot conclude that the state court's ruling

28   was an "unreasonable application."  Musladin, 549 U.S. at 77.

1    Further, as reasonably determined by the appellate court, there was very little, if any,

2 evidence in the record to support the instructions on allowable force, sudden quarrel/heat of

3 passion, and absence of malice.

4    Even if defense counsel requested the instruction on prior threats and harms in

5 CALCRIM No. 505, there was no support in the record for this instruction.  For an instruction on

6 antecedent threats and assaults, the prior threats or commission of harm have to be by the victim

7 or by third parties the defendant reasonably associated with the victim.  See People v. Moore, 43

8 Cal.2d 517, 527-529 (1954); People v. Pena, 151 Cal.App.3d 462, 475, 476-477 (1984); People

9 v. Bush, 84 Cal.App.3d 294, 304 (1978);  People v. Torres, 94 Cal.App.2d 146, 151 (1949);

10 People v. Minifie, 13 Cal.4th 1055, 1060, 1065-1067 (1996)).  In Minifie, the threats were made

11 by friends and cohorts of a man the defendant previously killed, and the victim of the charged

12 offenses was a friend of the deceased, so the victim of the charged offense was reasonably

13 associated with the prior threats.  Minifie, 13 Cal.4th at 1060-61.  While Petitioner may argue

14 that the group who confronted him in the present case was closely associated with the group that

15 had confronted him in 2004, there was no proof in the record to support this.  Petitioner has not

16 shown what was unreasonable about the state court's determination that his victims could not

17 reasonably be associated with his past aggressors.

18    Heat of passion manslaughter requires that the defendant must actually, subjectively kill

19 under the heat of passion, and there is an objective basis for the defendant's actions when

20 viewing the circumstances giving rise to the heat of passion.  See People v. Manriquez, 37

21 Cal.4th 547, 583-84 (2005).  Petitioner has not shown what was unreasonable about the state

22 court's determination that there was not substantial evidence of heat of passion despite

23 Petitioner's testimony.  Petitioner testified that "he did not lose 'his cool' and act rashly, or

24 without due deliberation and reflections, or from strong passion rather than judgment." (Pet., Ex.

25 A).  Therefore, it was reasonable for the court to determine that there was not sufficient evidence

26 for a heat of passion manslaughter instruction.  Petitioner's argument that the trial court should

27 have instructed on the absence of malice is akin to his argument on heat of passion manslaughter,

28 and therefore, for the reasons previously stated, there was not sufficient evidence to instruct on

1 the absence of malice.  In light of the evidence, it is clear the instructions on allowable force,

2 sudden quarrel/heat of passion, and absence of malice were not warranted.

3       Moreover, as pointed out by Respondent, any error was clearly harmless.  In an effort to

4 avoid a conviction for first or second degree murder, defense counsel strenuously argued that

5 Petitioner attacked the victim out of self-defense.  The jury was given CALCRIM No. 522 about

6 provocation and was instructed that the People had to prove beyond a reasonable doubt that

7 Petitioner had committed first degree murder rather than a lesser crime or no crime.  The jury

8 heard about the Petitioner's 2004 attack, and the jurors were instructed to "consider all the

9 circumstances as they were known to and appeared to the defendant and consider what a

10 reasonable person in a similar situation with similar knowledge would have believed."  (RT

11 2045).

12       The jury rejected the Petitioner's theory by finding Petitioner guilty of deliberate,

13 premeditated murder.  Thus, the jury clearly determined that Petitioner acted deliberately, and

14 not in the heat of passion, when he committed the murder.  For this reason, Petitioner cannot

15 show the failure to instruct the jury on heat of passion, absence of malice, and prior threats "had

16 a substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507

17 U.S. at 637.  Accordingly, Petitioner was not denied due process by being deprived of the

18 opportunity to present a complete defense.  <u>Mathews</u>, 485 U.S. at 63.  Thus, the state court

19 rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly

20 established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).  This claim must be denied.

21 **IV.**

22 **RECOMMENDATION**

23       Accordingly, the Court HEREBY RECOMMENDS that:

24     1.  The petition for writ of habeas corpus be DENIED WITH PREJUDICE; and

25     2.  The Clerk of the court be DIRECTED to enter judgment and terminate the case.

26       This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

27 United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

28 Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, __ F.3d __, __, No. 11-17911, 2014 WL 6435497, at *3 (9th Cir. Nov. 18, 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 5, 2014**

UNITED STATES MAGISTRATE JUDGE